06-3815-cv
Holcomb v. Iona College

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2007

(Argued: September 5, 2007                    Decided: April 1, 2008)

Docket No. 06-3815-cv

_____

CRAIG HOLCOMB**,**

*Plaintiff-Appellant*,

v.

IONA COLLEGE,

*Defendant-Appellee*.

_____

Before: WALKER, CALABRESI, and SACK, *Circuit Judges*.

_____

Appeal from an order of the United States District Court for the Southern District of New York (McMahon, *J.*), granting summary judgment to Defendant-Appellee on Plaintiff-Appellant's Title VII employment discrimination claim.

Vacated and remanded.

JEFFREY A. UDELL (Thomas J. Fleming *on the brief*) Olshan Grundman Frome Rosenweig & Wolosky LLP, New York, N.Y., *for Plaintiff-Appellant*.

RICHARD L. STEER (Anthony D. Dougherty *on the brief*) Tarter, Krinsky & Drogin LLP, New York, N.Y., *for Defendant-Appellee*.

_____

CALABRESI, *Circuit Judge*:

Plaintiff-Appellant Craig Holcomb appeals from a decision of the district court, which granted Defendant-Appellee Iona College's motion for summary judgment on Holcomb's claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Holcomb, who is white, claims that the college's decision to terminate his employment as an assistant coach of its basketball team was motivated by his marriage to a black woman. The college contends, instead, that Holcomb was removed from its staff as part of a necessary overhaul of a poorly performing team, and asserts that the decision was not based on race.

We hold, for the first time, that an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race. Further, we find that a reasonable jury could determine that Holcomb was fired in part because he was married to a black woman. Accordingly, we vacate the district court's judgment, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

**I. The Evidence in the Record**

We emphasize that, at this stage of the proceedings, we are required to construe the evidence adduced in the court below in the light most favorable to plaintiff's case. *See*, *e.g., Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001).

A. The Iona College Men's Basketball Team

In 1995, Craig Holcomb was hired as an assistant coach of the "Iona Gaels" men's basketball team. Holcomb reported both to the Head Coach, Tim Welsh, and to the college's Director of Athletics, a role filled at that time by Richard Petriccione.

In 1998, Welsh left and was replaced as Head Coach by Jeff Ruland, an alumnus of Iona, who was twice an NBA All Star, and who is white. When Ruland was appointed, Holcomb was made "Associate Head Coach." This new title denoted his position as the top assistant to Ruland, and was accompanied by a pay raise, but seemed to make no difference to Holcomb's day-to-day responsibilities as an assistant coach. When Ruland came on board, the Iona Gaels were enjoying considerable on-court success, and their good form continued for three seasons thereafter. The team won the Metro Atlantic Athletic Conference ("MAAC") Tournament in 1998, 2000, and 2001, thereby earning a spot in the National Collegiate Athletic Association ("NCAA") Men's Division I Championship Tournament in each of those years.

In June 2000, Holcomb married Pamela Gauthier, an African-American woman. In 2001, Ruland began a relationship with Iris Hansen, who was also an African-American woman and friend of Gauthier. Hansen and Gauthier often went to games and post-game functions together. In June 2001, Ruland signed a new eight-year contract as Head Coach. This contract, worth over $300,000 a year, made Ruland the highest paid employee at Iona.

From 1998 to 2004, Ruland supervised the same three assistant coaches: Holcomb worked alongside Tony Chiles, who is African-American, and Rob O'Driscoll, the most junior of the three,

who is white, and who was not in an interracial relationship. This case arises from the college's 2004 decision to fire Holcomb and Chiles, while deciding to retain O'Driscoll and Ruland.

B. Brennan and Petriccione

Of the five officers of the college formally involved in the decision to end Holcomb's employment, Holcomb imputes improper racial motives to two people: Shawn Brennan (the Director of Athletics) and Richard Petriccione (a Vice President of the college). Brennan and Petriccione were close colleagues. Before 2001, Brennan worked as Sports Information Director directly under Petriccione, who was then the Athletics Director. When Petriccione was promoted to Vice President, Brennan replaced him as Director of Athletics, and the two worked in tandem for a year-long transitional period.

As Vice President for Advancement and External Affairs, Petriccione was one of three Vice Presidents working immediately under the college President, Brother James Liguori. In that capacity, Petriccione was the chief fund-raising officer at the college, and worked on alumni relations, advertising, public relations, corporate and foundational grants, and scholarships. It was evidently no coincidence that an erstwhile Athletics Director was chosen for this post; sporting events and activities play a major part in Iona's alumni relations and fund-raising efforts. The men's basketball program, in particular, played a prominent role in Iona's alumni outreach endeavors.

Holcomb claims that both Brennan and Petriccione had prior histories of racially questionable conduct, and relies on these histories as support for his claim that the college's termination decision was based, at least in part, on the fact that his wife was black. In particular, Holcomb claims that

the termination decision was motivated by a perceived need to appeal to the pockets of Iona's mostly white alumni.

*1. Brennan*

In building his case that he was fired for racial reasons, Holcomb cites, among other things, Shawn Brennan's decision to bar high school students, and Holcomb's wife, from "Goal Club" events. The Goal Club is an Iona College alumni fundraising and social organization, and is overseen by the Director of Athletics. Members of the Club, most of whom are Iona alumni, pay an annual fee to the Athletics Department, and in return are invited to attend special functions and parties. Throughout the period under consideration, the Goal Club routinely held pre-game or post-game receptions with the players and coaches of the men's basketball team.

Holcomb asserts that, from at least 1997 until 2003, high school basketball players from local schools, including potential basketball recruits, were permitted to attend these post-game parties. The majority of high school students who attended these events were African-American. Moreover, Holcomb's African-American wife regularly accompanied him to Goal Club functions. On Holcomb's account, all that changed after a November 29, 2003 home game against George Mason University.

After the game, several basketball players from nearby Mount Vernon High School attended a Goal Club event with their coach. All these students were African-American. The college's version of events is that its Assistant Athletic Director for Compliance, Jamie Fogarty, noticed that their number included a highly prized student athlete whom Iona was attempting to recruit. Fogarty

was concerned that the student's presence violated NCAA recruiting regulations. Brennan then told Holcomb to ask all the high school players and their coach to leave. Brennan later barred high school students from future Goal Club events.

Holcomb took another view of the issue, and presents a different account of the college's motive for barring the students. On his reading of the NCAA's rules, permitting high school students to come to post-game events was at worst a "gray area." Moreover, Holcomb believed that the new policy would seriously hurt recruiting. He told Brennan as much at a later meeting. Suspecting that Brennan wanted to reduce African-American attendance at Goal Club events, Holcomb asked Brennan if he was "looking for a reason not to allow the student athletes to come."

At the same meeting, Brennan allegedly told Holcomb that Holcomb's wife, along with Ruland's girlfriend Iris Hansen, should no longer attend Goal Club functions.[1] His stated reason for excluding these two African-American women was that they were neither alumni nor donors. Holcomb, however, concluded that Brennan was again attempting to limit the number of black people at the college's fundraising events.

In addition to his allegations about the Goal Club, Holcomb also relies on testimony that Brennan, on seeing some of the college team's African-American players wearing hip-hop clothing, asked Ruland if he could "get these colored boys to dress like the white guys on the team."

---

[1] Brennan denies saying any such thing.

*2. Petriccione*

Holcomb has also adduced affidavits and testimony to the effect that Richard Petriccione was in the habit of making racially offensive comments. Early in his tenure as an assistant coach, Holcomb claims to have heard Petriccione say: "[E]verybody at Fordham thinks they have these good black kids, and Iona has niggers." A year later, when several black members of the Iona Gaels were accused of stealing and selling telephone access codes, Petriccione allegedly told Holcomb that the basketball program needed to "keep [its] niggers in line."

Colleagues at Iona testified to Petriccione's record of what might, charitably, be called racial insensitivity. Egregiously in this respect, Petriccione is said to have referred to a Nigerian employee at the Alumni Giving Office as a "jungle bunny" and an "African princess." When that member of staff applied to his office for the position of Assistant Director of Annual Giving, he remarked: "[W]hat does she think she is coming from a hut in Africa and thinking she could apply for this job?"

The most striking of the allegations against Petriccione relates directly to Holcomb and his wife. Plaintiff testified that in February 2000, he asked Petriccione whether he had received the wedding invitation that Holcomb and Gauthier had sent him. According to Holcomb, whose claim is backed up in this respect by a third party, Petriccione replied: "[Y]ou're really going to marry that Aunt Jemima? You really are a nigger lover."[2]

---

[2] Petriccione says this accusation is "ridiculous." **[A 335].**

## C. Discontent

After the successes of Ruland's first three years in charge, the men's basketball program began to suffer poorer fortunes. The parties dispute the extent of the downturn, but it is clear that the college had serious cause for concern about the team's on-court results and its off-court activities.

On the court, the team went from an impressive win-loss tally of 74-50 for the period of 1997 to 2001, to a lackluster record of 41-47 for 2001 to 2004. In stark contrast with the preceding seasons, the Gaels failed to make it to the NCAA tournament in 2002, 2003, or 2004. The team came under fire from the media and from fans for its inconsistent performances. In 2003-2004, the team finished seventh out of ten in the MAAC, and had a record of 11-18. The program also exhibited problems off the court. In late 2001, several players were discovered to have defrauded the college by buying books with book vouchers and selling the books for cash. Poor academic performance led to the dismissal of two starting players after the 2002-2003 season; two more were suspended for the same reason during the course of the 2003-2004 season. And in late 2003, the NCAA informed the college that it was investigating possible rules infractions by Iona men's basketball players and coaches. Ruland and O'Driscoll, but not Holcomb or Chiles, were interviewed in connection with that investigation.

On June 25, 2004, Brother Liguori was quoted in a local newspaper as saying that he was "not a happy camper." From his vantage point, the men's basketball program "seem[ed] to be going from bad to worse."

## D. Brennan's Reports

In March 2004, after the conclusion of the 2003-2004 season, Brennan was asked as Director of Athletics by Liguori and the Iona Board of Trustees to prepare a written report evaluating the men's basketball program, and to make recommendations for reform. Brennan submitted two reports: a preliminary report, and a final report. In the course of preparing the reports, Brennan consulted Petriccione on several occasions. Brennan presented each of his reports to the four people who ultimately made the termination decision. These four were: (1) the college President, Brother Liguori; and his three vice Presidents: (2) Petriccione (Vice President for Advancement and Alumni Affairs), (3) Sister Marie Thornton (Vice President for Finance), and (4) Dr. Warren Rosenberg (the college's Provost).

Brennan's reports noted a "[l]ack of team motivation," and stated that the Gaels were "[c]onsistently outperformed by teams with less talent." He found that there was "[p]oor team and individual academic performance." The "[n]umber one problem" with the men's basketball program was "[f]undamental lack of discipline." Initially, Brennan suggested three possible courses of action to shake up the team and get it back on track. First, the college might fire the entire coaching staff, including Ruland. Given the size of Ruland's contract, however, this would have cost the college a very large amount of money, and no-one seems to have seriously considered the possibility. Brennan presented a second option: firing all three assistant coaches. Third, the College could keep the current coaching staff in place.

In late March 2004, Brennan submitted a new report, offering final proposals for consideration. This final report ultimately counseled against firing the assistant coaches; to do so,

Brennan stated, would be akin to "only . . . cutting off appendages to the issue while the core remains." In addition to the three options mentioned above, Brennan added what he said was his preferred option: leave the coaching staff intact, place them on notice that there might be personnel changes as early as July if the situation did not improve, and impose as a condition of continued employment a twenty-five-point "strategic plan" to improve the program both on and off the court.

Brennan's reports made no specific criticisms of Holcomb, but did criticize the coaching staff as a whole, saying that they "[c]an't get along," that they were "[p]oor politically," and that they "[d]o not work as hard as they need to make this program successful." The one assistant coach who was mentioned specifically in Brennan's reports was O'Driscoll, of whom Brennan wrote, "Rob O'Driscoll works very well with others across campus."

E. The Termination Decision

The final report was presented to the President and Vice Presidents by conference call. Petriccione and Brennan say that, during this call, they supported the latter's fourth proposal: retaining the staff, putting them on notice, and implementing the 25-point program. Nothing was decided during the initial conference call.

The decision to terminate the employment of Holcomb and Chiles was reached in a later conference involving the President and three Vice Presidents. There was no formal vote; after a discussion, all four reached a collective decision. While it is apparent that the decision to keep Ruland in post was largely based on financial reasons, there is no contemporaneous record of the reasons for retaining O'Driscoll while firing Holcomb and Chiles. Later, in deposition testimony,

- 10 -

Liguori said that he felt "more drastic action" was needed than that favored by Brennan. "Rob O'Driscoll was asked to stay," Liguori says, "as a connection to the rest of the program and also because the athletics director thought he was doing an adequate job which I specifically remember reading in [Brennan's report]."

The record is equivocal as to whether Brennan had any role in the ultimate decision to fire Holcomb and Chiles and retain O'Driscoll; the college maintains that the final determination was presented to Brennan as a *fait accompli*. According to Brennan himself, however, he had, at some stage in the process, a face-to-face meeting with Brother Liguori, at which Liguori informed him that two of the assistant coaches would be fired. Brennan says that he and Liguori then "discussed that when you make a change like this, there needed to be someone in place to keep the program moving forward, to be with the kids, to make sure that things were being attended to, and in my opinion the best person to carry that out was Rob O'Driscoll." This testimony might be read to suggest that Brennan had a hand in deciding who exactly would be asked to leave. Later in his deposition, Brennan stated that "in his role on the coaching staff [O'Driscoll] was the one who was carrying out his duties to the best of his ability." In a meeting with Ruland at which Brennan transmitted to an angry Ruland the decision reached by the President and the three Vice Presidents, Brennan defended it fully, according to notes taken by Brennan. When Ruland asked him why Holcomb was chosen to leave, Brennan apparently replied: "In *my* evaluation [Holcomb and Chiles] have not provided you the proper level of support that you and our basketball program need to be successful" (emphasis added).

Holcomb was asked to resign; he refused, and was terminated by letter dated May 14, 2004. Tony Chiles was also asked to resign; he chose to do so at some point in May.

## F. Subsequent Developments

Just after the termination decisions were reached, the NCAA informed the college of the results of its investigation, indicating that the men's basketball program was guilty of several "secondary violations" of the Association's rules, none of which related to the Goal Club. The NCAA issued its report, attributing one of the violations to O'Driscoll, and blaming none on Holcomb or Chiles. The report cited O'Driscoll for moving the personal belongings of one of the players from a dorm to O'Driscoll's garage.

Though the college wanted to keep O'Driscoll, he was offered a position as First Assistant Coach at Marist, and he took it. The college hired three coaches to replace Holcomb, Chiles, and O'Driscoll, one of whom was African-American.

## II. The District Court's Decision

Holcomb brought suit on January 25, 2005. After discovery, the college moved for summary judgment, and the district court granted the motion. *Holcomb v. Iona College*, No. 05 Civ. 0848 CM, 2006 WL 1982764 (S.D.N.Y. July 11, 2006). Judge McMahon analyzed the case under the *McDonnell Douglas* framework, but concluded in the end that no reasonable jury could favor Holcomb on the merits of his suit. Even if Petriccione and Brennan had previously engaged in racist conduct, Holcomb "ha[d] not established any facts that link these alleged racist tendencies . . . to the administration's evaluation of the basketball program." *Id.* at *10. Holcomb, the district court held,

had produced "no evidence" that his firing was the product of improper discriminatory motives. *Id.* at *13.

Judgment for the college was entered on July 17, 2006. This appeal followed.

**DISCUSSION**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment is initially responsible for demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim. The non-moving party is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Anderson*, 477 U.S. at 255. On appeal from a decision to grant summary judgment, we review the record de novo to determine whether genuine issues of material fact exist requiring a trial. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

We have repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's

intent. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985). Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo*, 22 F.3d at 1224. Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment. *See Meiri,* 759 F.2d at 998.

Title VII of the Civil Rights Act of 1964, as relevant, provides that it is an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). In 1991, Congress amended the statute to make clear that "an unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). An employment decision, then, violates Title VII when it is "based in whole or *in part* on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (emphasis added) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 302, 312 (2d Cir. 1997)). To avoid summary judgment in an employment discrimination case, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995); *see also Holtz*, 258 F.3d at 78.

Holcomb has invoked the familiar "burden-shifting" framework set forth for Title VII cases by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973) and *Texas Dep't.*

*of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under these cases, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. *Id.* If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

For the reasons explained below, we find, first, that Holcomb has established a prima facie case of discrimination, and, second, that the college has produced evidence that it acted for a race-neutral reason. To that extent, we agree with the district court's conclusions. Unlike the district court, however, we find that plaintiff has established genuine issues of material fact as to the merits of his claim, and we therefore vacate the district court's decision to grant summary judgment to the college.

## I. Prima Facie Case of Discrimination

The burden of establishing a prima facie case of alleged disparate treatment "is not onerous." *Burdine*, 450 U.S. at 253. A plaintiff satisfies this burden if he or she introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor. Holcomb must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse

- 15 -

employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Feingold*, 366 F.3d at 152. The second and third elements of Holcomb's prima facie case are not in question; there is no dispute that Holcomb was qualified to be an assistant coach of the basketball team, nor, obviously, could it be doubted that his firing was an adverse employment action. The first and fourth elements, however, require further analysis.

A. Membership in A Protected Class

Holcomb alleges that he was discriminated against, not solely because of his own race, but as a result of his marriage to a black woman. This Court has never ruled on the question of whether Title VII applies in these circumstances. We resolve that question today, and hold that an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race.

One of the first cases to address the question, *Ripp v. Dobbs Houses,Inc.*, 366 F. Supp. 205, 208-09 (N.D. Ala. 1973), reached the opposite conclusion. There, a white employee claimed that he was discharged because of his association with black employees. The court decided the plaintiff's claim was not cognizable under the statute. It relied for this conclusion on the text of Title VII itself, which prohibits discriminatory action against an individual "because of *such individual's race*." 42 U.S.C. § 2000e-2(a) (emphasis added). On this view, Title VII does not help those who suffer adverse employment action as a result of association with persons of another race. *See also Adams v. Governor's Comm. on Postsecondary Educ.*, No. C80-624A, 1981 U.S. Dist. Lexis 15346 at *8-9 (N.D. Ga. Sept. 3, 1981) (rejecting a claim by a white man married to a black woman, because

"[n]either the language of the statute nor its legislative history supports a cause of action for discrimination against a person because of his relationship to persons of another race.").

We reject this restrictive reading of Title VII. The reason is simple: where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race. All the district judges in this circuit to consider the question, including the district court in this case, have reached that conclusion. *Holcomb*, 2006 WL 1982764 at \*9; *Rosenblatt v. Bivona & Cohen*, *P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996) ("Plaintiff has alleged discrimination as a result of his marriage to a black woman. Had he been black, his marriage would not have been interracial. Therefore, inherent in his complaint is the assertion that he has suffered racial discrimination based on his own race."); *Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975). The Fifth, Sixth, and Eleventh Circuits agree. *Deffenbaugh-Williams v.Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998), *vacated in part on other grounds by Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) ("Title VII prohibits discrimination in employment premised on an interracial relationship."); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 994-95 (6th Cir. 1999) (holding Title VII applicable to allegation that employee suffered discrimination because he had a biracial daughter); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.").

Accordingly, we find that Holcomb, in claiming that he suffered an adverse employment action because of his interracial marriage, has alleged discrimination as a result of his membership

- 17 -

in a protected class under Title VII.

### B.  Circumstances Giving Rise to an Inference of Discrimination

To complete his prima facie case, plaintiff must introduce evidence that he was terminated under circumstances which give rise to an inference of unlawful discrimination.  Drawing all permissible factual inferences in plaintiff's favor, we find that the evidence adduced by Holcomb comfortably meets this low threshold, which the Supreme Court has described as "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

The college decided to fire Holcomb, a white man married to a black woman, and Chiles, a black man, while retaining O'Driscoll, a white man who was not in an interracial relationship.  Moreover, it is plain that Brennan and Petriccione both knew that Holcomb was married to a black woman, and the record suggests that both Brennan and Petriccione played a role in the termination decision.  For each of these men, finally, Holcomb has adduced evidence of racially improper motives. As further detailed below, the record permits an inference that Brennan sought to reduce African-American presence at basketball program events for the sake of alumni relations and fundraising.  From this perspective, it would make sense for Brennan to want to keep O'Driscoll, as the only white member of the staff without a black girlfriend or spouse, rather than Holcomb.  And in the case of Petriccione, there is clearly evidence in the record indicating his disapproval of Holcomb's marriage to a black woman, and, indeed, of Petriccione's willingness to act on his disapproval by insulting Holcomb in public.

- 18 -

The fact that the college decided to keep Ruland, who was also in an interracial relationship, does not allay the suspicion that the firings were grounded in an illegitimate motive. It was agreed all around that Ruland was simply too expensive to fire, with over five years left on his contract, whether or not he was in a relationship with a black woman. At the prima facie stage, then, these circumstances are more than sufficient to support an inference that Holcomb was terminated on the basis of his interracial marriage.

*       *       *       *       *

Accordingly, we agree with the district court that Holcomb has established a prima facie case of race-based employment discrimination under Title VII.

## II. Non-Discriminatory Reason

Since plaintiff has made out a prima facie case of discrimination, the college must, if it is to shift the burden back to plaintiff, produce evidence that Holcomb was terminated "for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254. We find that defendant has produced evidence of a race-neutral reason.

As an initial matter, there is ample evidence that Iona had good reason to make *some* changes to its men's basketball program. The team was doing relatively poorly on the court, the academic performance of its players was disconcerting, the players and coaches were the subject of an NCAA investigation, and the college faced criticism from fans and in the local press. The college, however, cannot shift the burden back to Holcomb by relying on the need to reform the program in the

abstract. Rather, defendant must provide a non-discriminatory reason for the particular course of action it chose: to fire the white assistant coach who was married to a black woman, along with the black coach, while deciding at the same time to retain the white coach who was not in an interracial relationship.

As noted above, the evidence is somewhat scant regarding the college's reasons for its ultimate decision. The record, however, does contain evidence to support a non-discriminatory explanation for the decision to remove Holcomb and Chiles, while keeping O'Driscoll in place. Brother Liguori testified that he chose to retain one of the three coaches for the sake of continuity, and that he selected O'Driscoll because he had read in Brennan's reports that O'Driscoll worked well with other departments. Similarly, Brennan claims that he discussed with Liguori the wisdom of keeping at least one of the three assistant coaches. Brennan says that he stated his opinion to Liguori that, of the three assistants, O'Driscoll was doing the best job.

It is not our task, at the second stage of the *McDonnell Douglas* framework, to assess the credibility of these witnesses; nor is it our role to determine whether the college's explanation of its action is convincing. *Id.* Instead, we ask whether defendant has introduced evidence that, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason." *St. Mary's*, 509 U.S at 509. This test is satisfied by the testimony of Liguori and Brennan that they reached the decision on race-neutral grounds. Accordingly, we find that defendant has successfully discharged its burden of production under the second prong of *McDonnell Douglas*.

**III. Genuine Issues of Material Fact**

Because Iona has produced evidence that it acted for a non-discriminatory reason, Holcomb may no longer rely on the presumption of discrimination raised by the prima facie case. *Burdine*, 450 U.S. at 255-56; *St. Mary's*, 509 U.S. at 510-11. We now ask whether, without the aid of the presumption, Holcomb has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire him was based, at least in part, on the fact that his wife was black.

Direct evidence of discrimination, "a smoking gun," is typically unavailable, *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991), and this case is no exception to that pattern. It is well settled, however, that employment discrimination plaintiffs are entitled to rely on circumstantial evidence.[3]  In this respect, we have noted the need to be "alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464-65 (2d Cir. 1989) (quotation marks omitted).

Normally, in building a circumstantial case, employment discrimination plaintiffs contend, as Holcomb does here, that the employer's stated reason for the adverse employment action is entirely pretextual. And in many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

---

[3] In light of Congress's 1991 amendments to Title VII, the Supreme Court has squarely rejected the view that direct evidence of discrimination is required in mixed-motive cases. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003).

147 (2000); *see also id.* at 154 (Ginsburg, J., concurring) ("[E]vidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation."). In this respect, we observe that the college's stated reasons for choosing O'Driscoll, though sufficient to shift the burden back to Holcomb, are by no means overwhelming. That O'Driscoll, who was the only assistant coach under investigation by the NCAA, "work[ed] very well with others across campus" and "was doing an adequate job" are hardly compelling justifications for retaining him while firing Holcomb and Chiles. In other words, a jury might well find that Iona's explanation was pretextual.

It is important to stress, moreover, that a plaintiff who, like Holcomb, claims that the employer acted with mixed motives is not *required* to prove that the employer's stated reason was a pretext. A plaintiff alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the "impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." *Fields v. N. Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) (quotation marks omitted); *see also Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("It is . . . now settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.").

In maintaining that summary judgment is appropriate, the college relies heavily on the fact that Ruland, who was also in an interracial relationship, was retained as Head Coach of the team. A reasonable jury, however, could conclude that this fact is consistent with a finding of racial discrimination with respect to Holcomb's firing. Indeed, it is evident that, for whatever reason, at

least some of the relevant actors would have preferred to terminate Ruland. As noted above, however, removing Ruland would have imposed an enormous financial burden on the college. If part of the college's motivation was to diminish black and interracial presence on the coaching staff, then, given that Ruland was too costly to fire, a jury could readily conclude that the retention of O'Driscoll was motivated, at least in part, on the desire to keep the only assistant coach who was both white and not in an interracial relationship.

We emphasize that Holcomb has adduced little evidence to suggest that he was terminated *solely* because his wife was black. But he needs only to prove that the decision was partly so motivated to prevail on the ultimate merits of his claim.[4] Surveying the affidavits and deposition testimony produced by the parties, we conclude that there is a genuine issue of material fact to be tried in this case. In short, a fact-finder could find on this record (1) that Brennan and/or Petriccione preferred to remove Holcomb because his wife was black; and (2) that Brennan and/or Petriccione played a decisive role in the termination decision. A reasonable jury could favor plaintiff's version of events on each of these two steps, and thereby reach the conclusion that race played an illegitimate role in the college's decision.

Specifically, a reasonable jury could first find that Brennan, Petriccione, or both, possessed a racial motive to discriminate against Holcomb. This is obvious in the case of Petriccione, who was

---

[4] We note, in passing, that Title VII, as amended by the Civil Rights Act of 1991, provides a limited affirmative defense in so-called "mixed motive" cases. *See Desert Palace*, 539 U.S. at 94-95. Where an employer is found to have violated the statute, it has the opportunity to demonstrate, by a preponderance of the evidence, that it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B). If the defendant meets this burden, the court may not award damages or order reinstatement, but may still order declaratory relief and some forms of injunctive relief. *Id*.

apparently in the habit of making racially questionable remarks, and who in particular is alleged to have made a strikingly racist remark to Holcomb about him and his wife. In the case of Brennan, a reasonable jury might conclude that he possessed a more subtle racial motive. Viewing the evidence in the light most favorable to Holcomb, and bearing in mind Brennan's apparent desire to appeal to Iona's mostly white alumni base, a rational finder of fact could conclude that Brennan had an incentive, for the purposes of alumni relations, to minimize the number of African Americans involved with the basketball team. Such a motive could be inferred from Brennan's decree that high school students could no longer come to Goal Club events, a decision taken after a group of black high school students had attended. Though a jury might credit Brennan's stated rationale, that he feared an NCAA investigation on the issue, a jury might instead determine that this explanation was pretextual, taking into account Brennan's contemporaneous order that neither Holcomb's wife nor Ruland's girlfriend should come to the events. A jury could rely on these exclusions, and on other evidence attesting to a racially charged atmosphere surrounding the team, to conclude that, at a minimum, Brennan wanted to maintain at least some non-African-American presence on the team's staff.

Second, a reasonable jury could conclude that the decision to terminate Holcomb was influenced by Brennan, by Petriccione, or by both, working separately or together. The college contends that there is nothing in the record to show that Brennan or Petriccione played a role in the decision to select Holcomb for termination, and points to evidence in the record that it was Brother Liguori, rather than Brennan or Petriccione, who actually made the decision. But a Title VII plaintiff is entitled to succeed, "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in

- 24 -

the . . . process." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999). Here, there is ample evidence from which a reasonable jury could infer that Brennan, Petriccione, or both, played a meaningful role in the decision to terminate Holcomb. Brennan himself has testified that he told Brother Liguori that O'Driscoll was the best of the three coaches to retain; Petriccione was one of four actors who made the final firing decisions. True, the college has produced evidence that, if given a free hand, both Brennan and Petriccione would have preferred not to terminate any of the assistant coaches. Brennan's report recommended retention of all three, and Petriccione claims to have favored the same course as an initial matter. But a reasonable jury could perfectly well accept this evidence, and still find that the termination decision was motivated in part by racial discrimination. Once the decision was taken to fire two of the coaches and retain one for the sake of continuity, Brennan or Petriccione might well have urged the selection of O'Driscoll out of discriminatory motives. This is, at least, an issue of fact for the jury to decide. A rational trier of fact could, in other words, conclude that, once the decision was reached to retain the Head Coach and one of the three assistant coaches, Brennan and/or Petriccione urged the selection of O'Driscoll instead of Holcomb, and that at least one of them did so in part for racially discriminatory reasons.

In arguing that its motives were pure, the defendant also notes that one of the three new coaches it hired to work under Ruland after the departures of Holcomb, Chiles, and O'Driscoll was African-American. A jury might count this as evidence that the defendant did not base its termination decision on the fact that Holcomb's wife was African-American. Then again, a reasonable finder of fact might determine that the college hired a black coach as a way of concealing its prior discrimination. *See Gonzales v. Police Dept., City of San Jose, Cal.*, 901 F.2d 758, 762 (9th Cir. 1990) ("Curative measures simply do not tend to prove that a prior violation did not occur.").

Alternatively, the jury might conclude that the relevant actors were animated, not by racism *per se*, but instead solely by their disapproval of interracial relationships. Or, finally, the jury might accept that the college did not act with the motive of eliminating all African-Americans from the program's staff, but find that the college wanted nevertheless to have at least one coach who was neither black nor in an interracial relationship. In each of these cases, a reasonable jury could find that the termination decision was motivated, at least in part, by the fact that Holcomb was married to a black woman.

In effect, the college asks us to weigh the evidence for and against Holcomb's theory, but that is not our role when determining whether summary judgment is appropriate. The jury, of course, will be expected to take the defendant's contentions into account in reaching its ultimate conclusion as to whether Holcomb has established by a preponderance of the evidence that his termination was the result of racial discrimination.

## CONCLUSION

There is sufficient evidence in the record to permit a reasonable jury to conclude that the college's decision to terminate Holcomb was based, at least in part, upon a racially discriminatory motive. In light of this disputed issue of material fact, we **VACATE** the judgment of the district court, and **REMAND** the case for further proceedings consistent with this opinion.