STATE OF NORTH CAROLINA v. DAVID JOHN BROWN

No. COA09-841

(Filed 16 February 2010)

**Assault— deadly weapon—ethnic animosity—motion to dismiss—sufficiency of evidence—same race**

The trial court did not err by failing to dismiss the charge of assault with a deadly weapon with ethnic animosity under N.C.G.S. § 14-3 even though defendant contends that both he and the victim are the same race. Defendant shot at the victim because he was a white man in a relationship with an African-American woman.

Appeal by Defendant from judgment entered 25 February 2009 by Judge L. Todd Burke in Superior Court, Guilford County. Heard in the Court of Appeals 9 December 2009.

*Attorney General Roy Cooper, by Deputy Director Caroline Farmer, Victims and Citizens Services, for the State.*

*Mercedes O. Chut for Defendant-Appellant.*

---

McGEE, Judge.

David John Brown (Defendant) was indicted for assault with a deadly weapon with intent to kill and assault with a deadly weapon with ethnic animosity on 17 November 2008. According to the State's evidence at trial, Defendant twice fired his shotgun at Ray Peterson (Peterson) on 1 July 2008. Peterson was not hit by either shot. At the time of the shooting, Peterson was dating Katherine Richards (Richards), who was Defendant's next-door neighbor. Defendant and Peterson are both white and Richards is African-American.

The evidence for the State tends to show that Defendant and Richards had a history of heated disputes, often over issues such as Richards' dog, or Defendant's belief that Richards' fence encroached on Defendant's property. Richards testified that Defendant

> would throw things at my dog. He would hide behind the tree and hiss at me when I was feeding my dog. He would holler at me that I'd stolen his land and he was going to get me off of it; that I didn't know who his people were.

Defendant's arguments with Richards took on a racial tone that escalated in intensity as time passed. Richards testified that Defendant would call Richards' daughter "n———" as she would exit the school bus, and "say he was going to get her 'n——— gang a—' out of [Richards'] house and off of his land." This kind of conduct continued for at least a year prior to the incident leading to Defendant's arrest. About a week before the incident, Richards "ended up calling the police because [Richards' daughter] came in from hanging out with her friends . . . and [Defendant] did a heil Hitler sign, grabbing his crotch, called all of them n———s and a neighbor across the street heard it and I was just shaking." Richards testified that as she headed into her house, "[Defendant] looked at [Richards] and he said, 'n———, you're dead. You are a dead n———. N———, you're dead.' "

Peterson testified that Defendant

> was never respectful to [Richards]. He was, "Girl, let me tell you this. Girl, this damn dog. This isn't the way its going to work," like he is controlling her. Then he steps up to the black thing. Come on you all blacks. All you blacks are just alike. And then he goes up to the n——— thing.

Peterson testified that Defendant had threatened Richards' life and that: "The week previous [to the incident] [Defendant] told [Richards] she was dead[.]"

Richards testified that she had made prior calls to the police. Officer R.D. Goad of the Greensboro Police Department testified that he had responded to calls at Richards' address on multiple occasions and that Richards had "claimed that [Defendant] had shot at them." Presumably, "them" referred to Richards, Richards' daughter, and Peterson.

On 1 July 2008, Richards went into her yard to feed her dog before leaving to run an errand with her daughter. Defendant began harassing Richards, so she went back into her house and told Peterson, who was visiting at the time. Peterson told Richards and her daughter to go ahead and leave and he went outside to confront Defendant. Peterson walked down Richards' driveway. Peterson testified that Defendant began "spitting at [Peterson] off [Defendant's] back porch[.]" Peterson further testified that Defendant then said "[y]ou doing both them black b——s, ain't you, old man?" Defendant also called Peterson a "n—— lover." Peterson challenged Defendant to come off his porch so they could "settle this[.]" Peterson testified that in response 'to his challenge, Defendant said, "I got something for your a—[,]" and that Defendant then "went inside and he got that shotgun and he [came] out and he started shooting at me. He shot at me twice."

Peterson testified that he was a Vietnam War veteran, that one of Defendant's shots nearly hit him, and that he was convinced Defendant was trying to shoot him, not just scare him. Peterson went back inside Richards' house. Richards testified that she heard the shots as she was still on the street near her house at the time. Richards and her daughter returned to Richards' house and Richards called the police. Officer Goad responded.

Officer Goad testified that, after speaking with Richards and Peterson, he went to Defendant's house to speak with him. Defendant came to his front door, but he refused to allow Officer Goad into the house to check for weapons. Defendant used racial slurs as he talked about Richards and Peterson. Defendant went back into his house and Officer Goad returned to Richards' house to further question Richards. Officer Goad's assistant, Officer T.A. Boyer, recovered two shotgun shells and wadding from the discharged shells from Defendant's yard. Officer Goad went into Defendant's yard to look at the recovered shells and observed Defendant come out onto his back porch. Officer Goad noticed "a full bandolier of shotgun shells hanging on the back porch." Officer Goad described a bandolier as "kind

of like a *Rambo* thing. If you've seen *Rambo*, the movie, it goes across the front of your chest and you hold the shotgun shells in it."

Officer Goad again questioned Defendant. Defendant denied that he had shot any gun that day. When confronted with the shotgun shells, and an area of Defendant's yard that appeared to have been hit by a shotgun blast, Defendant stated he had been shooting squirrels in the backyard. Officer Goad testified that it violated la city ordinance to "shoot a firearm in the city limits period. And at that time I placed [Defendant] under arrest on my observations of the evidence[.]"

A search warrant was obtained to search Defendant's house, and a search was conducted that night. Officers located a shotgun behind one of Defendant's couches. Defendant testified at trial that he was "making a show of force as to just sitting on the back porch with my weapon." Defendant testified that Peterson "came to the back of the property. No other words were spoke . . . that evening, other than [Peterson asking] 'What are you going to do, shoot at me?' " Defendant testified that he "discharged a round up into the air," and that he then shot another round "into the ground," but not in Peterson's direction. Defendant accused the police of lying about statements he supposedly made that day, and also accused the police of planting inculpatory evidence at the scene.

The jury found Defendant not guilty of assault with a deadly weapon with intent to kill but guilty of assault with a deadly weapon with ethnic animosity. Defendant was sentenced to an active term of six to eight months, with credit given for time served. Defendant appeals.

In his sole argument on appeal, Defendant contends that the trial court erred in failing to dismiss the charge of assault with a deadly weapon with ethnic animosity because the evidence presented at trial was insufficient to support submitting that charge to the jury. We disagree.

" 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' " *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002) (citation omitted).

"In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. 'Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.' If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then ' "it is for the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty." ' "

"Both competent and incompetent evidence must be considered." In addition, the defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence. The defendant's evidence that does not conflict "may be used to explain or clarify the evidence offered by the State." When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence.

*Id.* at 596-97, 573 S.E.2d at 869 (internal citations omitted).

The crux of Defendant's argument is that the statute under which he was charged cannot apply to the facts presented at trial. Specifically, Defendant argues that because both he and Peterson are of the same race, N.C. Gen. Stat. § 14-3, the ethnic animosity statute, cannot apply. N.C. Gen. Stat. § 14-3 states in relevant part:

If any Class A1 or Class 1 misdemeanor offense is committed because of the victim's race, color, religion, nationality, or country of origin, the offender shall be guilty of a Class H felony.

N.C. Gen. Stat. § 14-3(c) (2007). Assault with a deadly weapon is a Class A1 misdemeanor. N.C. Gen. Stat. § 14-33(c)(1) (2007).

Defendant argues that because both he and the victim, Peterson, were of the same race, the assault with a deadly weapon could not have been "committed because of the victim's race[.]" This is a ques-

tion of first impression in North Carolina, and our review of other jurisdictions does not reveal guidance directly on point. However, the issue of whether acts committed by one person against another person of the same race or color may be considered discriminatory and the result of racial or ethnic "animosity" has been considered by federal courts in Title VII cases. In *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. N.Y. 2008), the Second Circuit, after a lengthy analysis of relevant law, held that "an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race" even when the employer and employee are of the same race. *Id.* at 138. The *Holcomb* Court reasoned:

> One of the first cases to address the question, *Ripp v. Dobbs Houses, Inc.*, 366 F. Supp. 205, 208-09 (N.D. Ala. 1973), [decided the question in the negative]. There, a white employee claimed that he was discharged because of his association with black employees. The court decided the plaintiff's claim was not cognizable under the statute. It relied for this conclusion on the text of Title VII itself, which prohibits discriminatory action against an individual "because of *such individual's race.*" 42 U.S.C. § 2000e-2(a) (emphasis added). On this view, Title VII does not help those who suffer adverse employment action as a result of association with persons of another race. *See also Adams v. Governor's Comm. on Postsecondary Educ.*, No. C80-624A, 1981 U.S. Dist. LEXIS 15346 at *8-9 (N.D. Ga. Sept. 3, 1981) (rejecting a claim by a white man married to a black woman, because "[n]either the language of the statute nor its legislative history supports a cause of action for discrimination against a person because of his relationship to persons of another race.").
>
> We reject this restrictive reading of Title VII. The reason is simple: where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race. All the district judges in this circuit to consider the question, including the district court in this case, have reached that conclusion. *Holcomb*, 2006 U.S. Dist. LEXIS 50437, 2006 WL 1982764 at *9; *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996) ("Plaintiff has alleged discrimination as a result of his marriage to a black woman. Had he been black, his marriage would not have been interracial. Therefore, inherent in his complaint is the assertion that he has suffered racial discrimination

based on his own race."); *Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975). The Fifth, Sixth, and Eleventh Circuits agree. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 589 (5th Cir. 1998), *vacated in part on other grounds by Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) ("Title VII prohibits discrimination in employment premised on an interracial relationship."); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 994-95 (6th Cir. 1999) (holding Title VII applicable to allegation that employee suffered discrimination because he had a biracial daughter); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.").

*Holcomb*, 521 F.3d at 139. The *Holcomb* Court stated:

> Holcomb [the plaintiff, who is white] alleges that he was discriminated against, not solely because of his own race, but as a result of his marriage to a black woman. This Court has never ruled on the question of whether Title VII applies in these circumstances. We resolve that question today, and hold that an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race.

*Id.* at 138. Holcomb was an assistant men's basketball coach at Iona College. According to Holcomb's complaint, prior to his firing, two Iona administrators—the Athletics Director and a Vice-President—had made multiple offensive comments about Holcomb's wife, and they had taken actions that suggested racial bias. One particularly offensive comment attributed to one of the administrators was a statement directed at Holcomb before he married: " '[Y]ou're really going to marry that Aunt Jemima? You really are a [n———] lover.' " *Id.* at 134. It was the comments made, and actions taken, by the administrators upon which the Second Circuit based its determination that Holcomb had made out a *prima facie* case of employment discrimination based upon *his* race, even though he was of the same race as the two administrators. *Id.* at 140.

We note that in *Holcomb*, just as in the case before us, a defendant called the alleged victim a "n——— lover" before taking allegedly illegal race-based action. This is relevant because it is the alleged victim's race that is at issue. It is possible that no illegal race-

based action would have occurred in either case had the victims been African-American, instead of white, because then there would have been no interracial relationships.

The Second Circuit and other jurisdictions, cited in *Holcomb*, have determined that the possibility that a white defendant took action against another white person based upon that defendant's bias against interracial relationships can constitute discrimination based upon race, even though both the defendant and the victim are of the same race. "[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race." *Holcomb*, 521 F.3d at 139.

> The Sixth Circuit explained why an associational discrimination claim is based on the plaintiff's race in *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988 (6th Cir. 1999). In *Tetro*, a white former employee brought a Title VII action alleging that his former employer discriminated against him because he had a bi-racial child. The circuit court explained:
>
> "If he had been African-American, presumably the dealership would not have discriminated because his daughter would also have been African-American. Or, if his daughter had been Caucasian, the dealership would not have discriminated because Tetro himself is Caucasian. So the essence of the alleged discrimination in the present case is the contrast in races between Tetro and his daughter. This means that the dealership has been charged with reacting adversely to Tetro because of Tetro's race in relation to the race of his daughter. The net effect is that the dealership has allegedly discriminated against Tetro because of his race." *Id.* at 994-95.

*Floyd v. Amite County Sch. Dist.*, 581 F.3d 244, 250 (5th Cir. Miss. 2009). *Tetro* accordingly held that the discharge of the plaintiff-employee violated Title VII. *Tetro*, 173 F.3d at 995; *see also Ventimiglia v. Hustedt Chevrolet*, 2009 U.S. Dist. LEXIS 24834, 32-33 (E.D.N.Y. Mar. 25, 2009) ("[A] jury could conclude that [the plaintiff] was subject to a hostile work environment [from his male employer] because of his sex. In other words, but for his sex, male, his relationship with his co-worker, female, construing all facts most favorably to him as the non-movant, would not have been an issue.").

Similar discrimination claims have been recognized in a Section 1981, 42 U.S.C. § 1981(a)[1], context.

> It is well-settled that a claim of discrimination based on an interracial relationship or association is cognizable under Section 1981. *See*, e.g., *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 890 (11th Cir. 1986) (a claim of discrimination based upon an interracial marriage is cognizable under Section 1981); *Fiedler v. Marumsco School*, 631 F.2d 1144, 1150 (4th Cir. 1980) (a white student expelled from school for allegedly dating a black student had standing to sue under Section 1981); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir. 1975) (a white man who was discriminated against because he sold his house to a black person has standing to sue under Section 1981); and *Faraca v. Clements*, 506 F.2d 956 (5th Cir.), *cert. denied*, 422 U.S. 1006, 45 L. Ed. 2d 669, 95 S. Ct. 2627 (1975) (Section 1981 proscribes discrimination based on an interracial marriage). Moreover, *Adams v. Governor's Comm. on Postsecondary Educ.*, 26 Fair Empl. Prac. Cas. (BNA) 1348, 1981 WL 27101 at *3 (N.D. Ga. Sept. 3, 1981), a case relied on by defendant in its Title VII argument, held that plaintiff also had standing to sue under Section 1981.

*Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996).

In the case before us, the State argues on appeal that N.C. Gen. Stat. § 14-3(c) applies because not only Peterson, but also Richards, was a victim of Defendant's actions. According to the State's argument, Richards was a victim because Richards is African-American and Defendant had a history of racist behavior towards Richards; thus, Defendant's acts on 1 July 2008 are properly understood as having been committed because of the victim's race or color. We reject this argument. Richards was on the street near her house in her vehicle at the time of the shooting. Though Richards undoubtedly suffered emotional distress due to Defendant's actions, she was not the victim of any assault with a deadly weapon; however, Peterson was.

The trial court, in denying Defendant's motion to dismiss, stated:

---

1. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[Defendant's] [c]ounsel stated that the statute calls for the attack to be . . . motivated by race. In that sense the alleged victim is a white male and the defendant is a white male, that the statute did not apply. However, the facts bear out as alleged by the State that although there are two white males involved, the attack on the alleged victim was because of his relationship with a black female.

We agree with the trial court's analysis on the facts of this case. First, the bill enacted by the General Assembly amending N.C. Gen. Stat. § 14-3 to include the relevant provision was titled: "An Act to Provide Increased Sentences for Crimes Committed with Ethnic Animosity." There is nothing in either the language of N.C. Gen. Stat. § 14-3, or the title of the bill, to suggest the General Assembly intended a narrow construction of what constituted "ethnic animosity" or acts "committed because of the victim's race or color."

When viewed in the light most favorable to the State, Defendant shot at Peterson because Peterson was a white man in a relationship with an African-American woman. Had Peterson been an African-American, Defendant might not have shot at Peterson. Therefore, the jury could reasonably find that Defendant only shot at Peterson because Peterson was white, and Defendant was acting out his disgust with, or anger towards, Peterson because of Peterson's relationship with a woman of a different race or color. Guided by the intent of the General Assembly in enacting N.C. Gen. Stat. § 14-3, which we interpret as a general intent to provide for enhanced sentences for certain crimes committed based on "ethnic animosity," and further guided by the federal case law cited above, we hold that the trial court did not err in denying Defendant's motions to dismiss. This argument is without merit.

No error.

Judges STEELMAN and STEPHENS concur.