Eric **MOORE**, Plaintiff,

v.

**METROPOLITAN TRANSPORTATION AUTHORITY, Elliot Sander, Wiliam Morange, Kevin McConville and Terrance Culhane, Defendants.**

No. 07 CIV. 3561 DAB.

United States District Court, S.D. New York.

Aug. 22, 2013.

Deanna R. Waldron, Steven J. Hyman, Janet Cohn Neschis and Jonathan Robert Jeremias, McLaughlin & Stern, LLP, Norman H. Siegel, Siegel Teitelbaum & Evans LLP, Rachel Dara Nicotra, New York, NY, for Plaintiff.

Craig Robert Benson, Stephen Andrew Fuchs and Elias Jay Kahn, Littler Mendelson, P.C., New York, NY, Keith Jay Rosenblatt, Littler, Mendelsohn, P.C., Newark, NJ, for Defendants.

## MEMORANDUM AND ORDER

DEBORAH A. BATTS, District Judge.

Plaintiff Eric Moore ("Plaintiff" or "Moore"), an African–American male, together with eight African–American plaintiffs and one Hispanic plaintiff, all of whom are current or former employees of the Metropolitan Transportation Authority ("MTA") Police Department ("MTA PD"), commenced this action against MTA and four MTA executive officers (collectively, "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and 42 U.S.C. §§ 1981 and 1983. Plaintiff maintains that Defendants discriminated against him on the basis of his race by denying him promotions, transfers, and training, and subjecting him to a hostile work environment; engaged in a pattern or practice of racial discrimination; and retaliated against him for complaining to the New York State Division of Human Rights ("SDHR") about alleged discrimination and bringing the instant lawsuit. Defendants now move pursuant to Fed. R.Civ.P. 56 for Summary Judgment on each of Plaintiff's claims.[1]

For the reasons below, Defendants' Motion for Summary Judgment is granted in part, denied in part, and the Court reserves decision in part.

## I. FACTUAL BACKGROUND

### A. The Parties

Defendant MTA is a New York State public benefit corporation that provides public transportation services to the Greater New York City area. Defendant Elliot Sander served as the Executive Director and Chief Executive Officer of MTA from January 1, 2007 to May 7, 2009. Defendant William Morange was MTA Director of Security from July 2003 to December 2010. Defendant Kevin McConville was the Chief of the MTA PD from October 2005 to January 2008. Defendant Terrance Culhane was an Assistant Deputy Chief of the MTA PD from 2004 to July 2010.

Plaintiff Eric Moore began employment as a police officer with the Long Island Railroad Police Department ("LIRR PD") on February 28, 1994. In 1997, the New York State Legislature created the MTA, and on January 1, 1998, all employees of the LIRR PD, including Plaintiff, were transferred to the MTA PD.

### B. Plaintiff's Employment with the MTA PD

Following the formation of the MTA PD in 1998, Moore accepted a position in MTA's Ceremonial Unit. (Pl.'s 56.1 Stmt. ¶ F.) He also became an active member of the Guardians Association, a fraternal organization of African–American law enforcement officials whose mission was to address racial discrimination within the

---

**1.** In a Scheduling Order dated September 24, 2010, the Court allowed separate Motions for Summary Judgment to be submitted for each individual Plaintiff in this action. This Memorandum and Order addresses only the Motion for Summary Judgment filed with respect to the claims instituted by Plaintiff Eric Moore.

MTA PD. (Moore Decl. ¶ 7.) In 1999, Moore became a Field Training Officer. (Defs.' 56.1 Stmt. ¶ 41.)

In 2000, Plaintiff submitted an abstract[2] for assignment to the Anticrime Unit and general Detective Division. (Pl.'s 56.1 Stmt. ¶ I.) MTA denied Moore's application, allegedly due to his race. (*Id.*) According to Plaintiff, Union Vice President Vincent Provenzano subsequently told him that "while you're a good guy, and you have plenty of arrests, it's really who you know"; in the same conversation, Provenzano allegedly pointed to his arm, indicating his skin, and said, "This is going to hold you back." (Moore Decl. ¶ 10.) In 2001, Plaintiff was assigned to work with African–American Officer Mark Thomas, and was allegedly instructed "to advise [Thomas] of how a minority officer is to conduct himself." (Pl.'s 56.1 Stmt. ¶ LL; Thomas Dep. 73:21–74:1.) Moore alleges that this same year, three people told him that a Caucasian supervisor, Sergeant James Quinn, had called him "Little Farrakhan." (Moore Dep. 146:2–6, 146:17–24.) In 2002, Plaintiff submitted an abstract for promotion to Detective. (Pl.'s 56.1 Stmt. ¶ J.) He was again not chosen, allegedly because of his race. (*Id.* ¶¶ K, N.) Plaintiff transferred to District 4—Penn Station in 2004. (*Id.* ¶ O.)

## C. Plaintiff's 2005 Application for Promotion to Detective

In March 2005, MTA published a Personnel Order requesting abstracts for promotion to Detective. (*Id.* ¶ U.) Moore submitted an abstract, and interviewed on March 29, 2005. (Fuchs Decl. Ex. 8, at D00005671.) On or before April 8, 2005, interviewer Jessie Crawford created a spreadsheet comparing Detective candidates. (Jeremias Decl. Ex. I.) The chart contained two columns for candidates' interview scores and one column for miscel-

laneous comments. (*Id.* at D00036067.) The interview score columns listed the number of bolded (i.e. important) and unbolded (i.e. less important) points the candidates hit upon in the scenario-question portion of the interview. (*Id.*) Moore's "total bold" score was the same as Michael Alfalla, one of the candidates selected for Detective, and lower than the three other selected candidates, Luis Eleutice, Richard Lagnese, and Brian Longaro. (*Id.*) His "total unbold" score was higher than Eleutice and Lagnese's, the same as Alfalla's, and lower than Longaro's. (*Id.*) Plaintiff's MTA PD service was longer than all the selected candidates, the same length as one unselected candidate, and shorter than three unselected candidates. (*Id.*) The comments regarding Plaintiff were, "11 MTA; FTO; Excellent Police Duty; Medal of Merit." (*Id.*)

On April 8, 2005, interviewer Stephen Conner "tinkered" with Crawford's spreadsheet, adding columns for report writing, attendance, and discipline. (Fuchs Decl. Ex. 10.) Conner also added comments in the "Comments" column. (*Id.*) Longaro and four candidates not selected as Detectives received new positive comments, while Alfalla and three unselected candidates received new negative comments. (*Id.*) Moore did not receive any new comments in the "Comments" column. (*Id.*) However, in the "Report Writing" column, Conner wrote "average and brief" for Plaintiff, while making more positive notes about the reports of Alfalla, Eleutice, Lagnese, and Longaro. (*Id.*) In addition, the modified chart showed that the four selected candidates had better attendance records than Plaintiff. (*Id.*)

Moore argues that Alfalla, Eleutice, Lagnese, and Longaro were less qualified than him. For instance, the interviewers noted that Alfalla was "slow in responding" and "nervous," lacked confidence, "strug-

---

**2.** The MTA PD refers to applications as "abstracts." (Pl.'s 56.1 Stmt. ¶ I.).

gled through scenarios but did ok," gave "less than average" responses, and did much worse than some interviewees. (Pl. 56.1 Stmt. ¶ AA; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ AA.) Lagnese did not submit a timely application, conceded that his report writing skills needed improvement, and rambled during his interview. (Pl.'s 56.1 Stmt. ¶ Z.)

In September 2006, MTA selected Alfalla (Hispanic), Eleutice (Hispanic), Lagnese (Caucasian), and Longaro (Caucasian) to be Detectives, and did not select Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 16, 27; Pl.'s 56.1 Stmt. ¶ V.) Plaintiff affirms that Alfalla identifies himself to MTA PD employees as white, and that Alfalla and Eleutice are light-skinned. (Moore Decl. ¶ 17.) However, Alfalla affirms that he is Hispanic and that he identifies himself as such. (Alfalla Decl. ¶ 2.)

After the promotion denial, Plaintiff told two supervisors uninvolved in the selection process, Lieutenant Robert Howell and Sergeant Richard Smith, that he believed the selections were discriminatory. (Pl.'s 56.1 Stmt. ¶ CC; Conner Reply Decl. ¶ 6.) In response, Howell asked Plaintiff, "[W]hat have you done to go over and beyond?" and encouraged Plaintiff to "do something that will keep them from saying no." (Moore Dep. 109:7, 263:1–2.) When Plaintiff asked Howell whether he meant that Lagnese and Longaro had "done things above and beyond," Howell responded, "I'm not saying that." (Id. at 109:8–12.) When Plaintiff asked whether Howell was "saying that I have to be ten times better than my ... white counterparts," Howell said, "I'm not saying that either." (Id. at 109:12–15.) Howell and Smith both told Plaintiff that Defendants were "going to promote who they want to

promote." (Id. at 263:9–10, 265:17–18.) Smith responded to Plaintiff's complaint that there were "no black detectives ... on the east, and they don't want black detectives on the east," by stating, "[T]hat's not true, because ... Ike Dennis could be a detective if he wanted to be a detective." (Id. at 266:2–8.) Plaintiff thinks that Defendants consider African-American Officer Ike Dennis to be "less confrontational" than Plaintiff, because Dennis "doesn't speak out" about "any issues that came up regarding race." (Id. at 115:7–14.)

### D. Plaintiff's 2006 Request for Transfer to the K–9 Unit

On August 4, 2005, MTA published an Interim Order inviting MTA PD members interested in being assigned to the K–9 Unit, a specialized unit in which MTA PD officers use highly trained dogs to enhance security, to submit abstracts by August 15, 2005. (Defs.' 56.1 Stmt. ¶ 35; Jeremias Decl. Ex. AAA.) Plaintiff did not submit an abstract, and in September 2005 MTA appointed ten people to the K–9 Unit. (Pl.'s 56.1 Stmt. ¶ FF.) In early July 2006, K–9 Unit supervisors told Plaintiff about upcoming openings in the Unit. (Id. ¶ FF.) On July 13, 2006, Plaintiff emailed Inspector Joseph Martelli, Commanding Officer of the Special Operations Division, about the "recent rumors of future K–9 candidates," writing, "I respectfully submit a request to be considered for the K–9 Unit and will provide an abstract." (Fuchs Decl. Ex. 22.) Martelli denied Plaintiff's request, stating that MTA PD would "select upcoming positions in the Canine Unit" from a "pool of candidates" consisting of officers who had timely responded to the August 4, 2005 Interim Order. (Fuchs Decl. Ex. 22.)[3] In January 2007,

---

**3.** Plaintiff alleges that additional interviews were conducted after this email exchange, citing to a report by an MTA Equal Employment Opportunity ("EEO") Specialist that states the interviews occurred between August 26 and August 31, 2006. (Pl.'s 56.1 Stmt. ¶ HH; Jeremias Decl. Ex. LL.) Chief McCon-

MTA promoted sixteen officers to the K–9 Unit, of whom thirteen were Caucasian, two were Hispanic, and one was African–American. (Defs.' Reply to Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 35; Fuchs Decl. Exs. 15, 23; Jeremias Decl. Ex. JJ.) Plaintiff was not promoted. (Pl.'s 56.1 Stmt. ¶ HH.)

Plaintiff alleges that MTA's policies require publication of an Interim Order soliciting abstracts each time new openings arise in the K–9 Unit. (*Id.* ¶ FF.) He cites to the following deposition testimony of Chief McConville:

Q: And once the selection is made and you issue a personnel order what happens then to the list of names that were submitted for consideration?

A: ... We fill the vacancies that we have. And then we would begin the process all over again if there were additional vacancies at some other point in time.

Q: So that once you have completed the number of vacancies you then would start a new process if there was a vacancy a year later, let's say?

A: Yes.

(McConville Dep. 309:12–25.) Defendants allege that no such policy existed. Inspector Martelli avers that "there is no rule or policy requiring that a new [Interim Order] be issued and an entire new round of interviews be conducted every time vacancies arise." (Martelli Reply Decl. ¶ 6.) Defendants also cite to two other instances in which multiple rounds of appointments were made from a single applicant pool or promotional ranking. From a pool of candidates who applied to become Detectives in September 2003, MTA selected one group of Detectives in November 2003 and two additional Detectives in February 2004. (Defs.' Reply to Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 35; Fuchs Reply Decl. Exs. 1, 4, 7; Jeremias Decl. Ex. HH.) In addition, selections for Lieutenant in August 2007, November 2008, and December 2009 were based entirely on a "Lieutenant Promotional Ranking" list published in June 2007. (Fuchs Reply Decl. Exs. 10–11.) The June 2007 Promotional Ranking list stated, "This list shall remain in effect until the Department publishes a new Lieutenant Promotional List." (*Id.* Ex. 10, at D00007360.)

Several African–American officers have filed complaints or testified that K–9 Unit hiring is discriminatory. (Pl.'s 56.1 Stmt. ¶¶ II–JJ.) In response to one complaint, the SDHR found probable cause of discrimination, noting that "[t]he Canine unit has ... proved to be particularly difficult for Black officers to enter." (Jeremias Decl. Ex. KK, at D00031565–66.)

### E. Plaintiff's 2007 Application for Promotion to Detective

On February 14, 2007, MTA published an Order requesting abstracts from officers seeking promotion to Detective. (Pl.'s 56.1 Stmt. ¶ VV.) Moore submitted an abstract, and interviewed on May 22, 2007. (*Id.* ¶¶ WW–XX.) Out of the twenty-seven officers interviewed, Defendants identified ten officers for further consideration; Plaintiff was not one of the ten. (*Id.* ¶ YY; Jeremias Decl. Ex. AA.) On August 1, 2007, MTA announced the promotions of David Cheung (Asian), Paul Dunn (African–American), Rhiannon McDermott (Caucasian), Leonard Pomposello (Caucasian), and Alfred Schreck (Caucasian) to Detective. (Pl.'s 56.1 Stmt. ¶ ZZ.) On August 27, 2007, MTA revised

---

ville's testimony also supports Plaintiff's allegation. (McConville Dep. 306:24–307:5.) However, Defendants argue that the EEO Report's reference to 2006 is a typographical error; in support, Defendants point to the K-9 Unit interviewers' notes, which are dated between August 26 and September 1, 2005. (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ HH; Fuchs Reply Decl. Ex. 5.).

the announcement to exclude Schreck. (Fuchs Decl. Ex. 14.)

Plaintiff argues that he was exceptionally qualified to be promoted to Detective because he had thirteen years of service with MTA PD and was highly recommended, proficient with the Tiburon system, and responsible for supervising and training less-experienced officers. (Pl.'s 56.1 Stmt. ¶¶ WW, YY). Plaintiff's interviewers described him as "very positive," and "detailed, had great experience, and seemed familiar with protocol for varied incidents." (Id. ¶ XX.) Each interviewer noted Plaintiff's desire to improve his attendance, with one interviewer adding that Plaintiff's attendance "could be [an] issue for small unit staffing." (Fuchs Decl. Ex. 17, at D00007359; Ex. 18, at D00007351; Ex. 19, at D00007329.) Plaintiff's interview packet also included a statement from his supervisor that Plaintiff "use [sic] to be very active" but "may have diminished his activity." (Fuchs Decl. ¶ 21 & Ex. 20.)

Plaintiff claims that his attendance record was similar to that of Pomposello (promoted) and Thomas Finneran (identified for further consideration). (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 24R.) In 2005, Pomposello had 180 hours of sick time, while Moore had 108 hours. (Jeremias Decl. Ex. O.) However, in 2007, Pomposello had only forty-eight hours of sick time compared to Plaintiff's 144 hours. (Fuchs Reply Decl. Ex. 13.) Finneran had one twelve-day sick occurrence between March 8, 2006 and March 7, 2007. (Jeremias Decl. Ex. J, at D00017446.) Although it is not clear how many sick days Plaintiff took during that precise twelve-month period, he had nine sick days between April 2005 and March 7, 2006, two sick occurrences totaling six days between March 8 and August 3, 2006, and approximately twenty[4] sick days between August 4, 2006 and May 22, 2007. (Fuchs Decl. ¶ 21 & Exs. 12, 20, 21.) Thus, Finneran had one twelve-day sick occurrence between March 8, 2006 and March 7, 2007, while Plaintiff had at least three sick occurrences totaling twenty-six days between March 8, 2006 and May 22, 2007. Finneran's sick days, then, average to one sick day per month, whereas Plaintiff's sick days average to 1.8 sick days per month.

Plaintiff alleges that he received a more positive evaluation from the interview panel than the ten officers identified for further consideration. (Pl.'s 56.1 Stmt. ¶ YY.) While the interviewers did make some negative comments about these candidates' interview performance, prior experience, and disciplinary history, most of their comments were positive evaluations of the candidates' interview performance, skills, knowledge base, and predicted effectiveness as Detectives. (See Pl.'s 56.1 Stmt. ¶¶ AAA–DDD; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ AAA–DDD; Jeremias Decl. Ex. J, at D00017446, D00017035, D00017180; Ex. CC, at D00017279; Ex. DD, at D00017067, D00017349, D00017351.) Plaintiff also notes that Dunn, the African–American officer promoted to Detective, never made a complaint of race discrimination. (Pl.'s 56.1 Stmt. ¶ GGG.)[5]

---

**4.** Undated notes of a conversation with Moore's supervisor, produced as part of Plaintiff's 2007 interview packet, state Plaintiff used 282 sick hours (around thirty-five days) since April 2005. (Fuchs Decl. ¶ 21 & Ex. 20.) Viewing the document in the light most favorable to Plaintiff, the Court assumes that the conversation took place on the date of Plaintiff's interview, May 22, 2007. Plaintiff took sick leave on fifteen days between April 2005 and August 3, 2006, but neither Party identifies the specific days Plaintiff was absent after August 3, 2006. After subtracting the fifteen days of sick leave used before August 4, 2006 from the thirty-five sick days taken from April 2005 to May 2007, the Court infers that Plaintiff used twenty sick days from August 4, 2006 to May 22, 2007.

**5.** MTA was aware of Plaintiff's discrimination complaints during the 2007 Detective selection process. (Crawford Dep. 272:6–9.).

In an August 21, 2007 letter addressed to Chief McConville, Plaintiff stated that there had been "discrepancies with the [May 2007] interview process," citing to a variation in the number of interviewers on each interview panel. (Jeremias Decl. Ex. BB, at D00007243.) Plaintiff also asked McConville to explain the criteria used to compile the list of officers selected as detectives, the order of the list, where Plaintiff "fit in" in the list, and the name of the person who created the list. (*Id.*) On September 26, 2007, Jessie Crawford, Assistant Director of Employment and Compensation Services, responded:

> Police Officers in consideration for appointment to Detective in 2007 were interviewed by panels comprised of from two to four members of the MTA PD and a representative of the MTA's Human Resources Department. The final selection of Police Officers for appointment as Detectives was based upon the panel's assessment of their individual experience, achievement, skills, and performance in the interview process.

(*Id.* at D00007242.)

### F. Plaintiff's Requests for Training

In May 1999 and September 2004, Moore asked his supervisors to "keep [him] in mind" for any upcoming training or educational classes. (Jeremias Decl. Ex. PP.) In January 2005, Plaintiff sought permission to attend Plainclothes Training. (Pl.'s 56.1 Stmt. ¶ P.) Plaintiff alleges that Assistant Deputy Chief Culhane denied Plaintiff's request for the training; Defendants dispute Culhane's involvement. (*Id.;* Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ P.) Between January 14, 2005 and April 26, 2005, seventeen Caucasian officers (including Longaro and Lagnese), five Hispanic officers, and four African–American officers were assigned to Plainclothes Training. (Pl.'s 56.1 Stmt. ¶ Q; Fuchs Decl. Ex. 15; Jeremias Decl. Ex. MM.) Plaintiff alleges that the four African–Americans' average

time on the force until receiving Plainclothes Training was more than double that of the seventeen Caucasian officers. (Pl.'s 56.1 Stmt. ¶ Q.) Plaintiff subsequently complained to Inspector Kevin King about the lack of training opportunities provided to him, and on June 14, 2005, he was assigned to Plainclothes Training. (*Id.* ¶ R.) Although the 2005 Personnel Order lists " 'Plain Clothes' or other investigative background" as a desired qualification (Jeremias Decl. Ex. S), Defendants allege that Plaintiff's lack of Plainclothes Training as of his March 2005 interview was not among the reasons for MTA's September 2006 promotion denial (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ Q, R). Plaintiff does not allege that between his Plainclothes Training and the September 2006 Detective selections he advised the interview panel or anyone else of his completion of the Training. (*Id.* ¶ R.)

Plaintiff claims that after Plainclothes Training, he was not assigned any training other than Terrorism Preparedness Training until he filed the instant lawsuit. (Pl.'s 56.1 Stmt. ¶ S.) However, Defendants allege that Moore was assigned to three discretionary training courses between July 2006 and November 2006. (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ G; Fuchs Decl. Ex. 13, at D00007297.) According to Plaintiff, notices of training courses were given to higher-ranking officers and passed onto lieutenants and sergeants who routinely selected Caucasian officers, rather than African–Americans such as Plaintiff, for the trainings. (Pl.'s 56.1 Stmt. ¶¶ G, O, RR.) Although notices of training courses were publicly available online, officers could not access the relevant websites through MTA computers. (*Id.* ¶ G; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ G.)

In June 2007, Plaintiff's supervisor informed him of the possibility of attending Terrorism Preparedness Training; Plaintiff alleges that he was subsequently told

that Assistant Deputy Chief John D'Agostino had cancelled the course. (Pl.'s 56.1 Stmt. ¶ T.) Defendants allege that Terrorism Preparedness Training, an off-site Pennsylvania-based course, was postponed because MTA intended to replace it with on-site counter-terrorism training (Pro-Active Terrorist Recognition and Interdiction Operations and Tactics ("PATRIOT") Training) in 2008 and 2009. (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ S.) Plaintiff received PATRIOT Training in February 2009 (*id.*), but alleges that PATRIOT Training was "completely different" from Terrorism Preparedness Training (Moore Decl. ¶ 30).

### G. Plaintiff's Complaint to the State Division of Human Rights

On July 21, 2006 Plaintiff filed a Complaint against MTA with the SDHR, alleging that Defendants discriminatorily denied Plaintiff career-advancing appointments and specialized training. (Pl.'s 56.1 Stmt. ¶ RR.)

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *see also Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005). Genuine issues of material fact cannot be created by conclusory allegations. *Victor v. Milicevic*, 361 Fed.Appx. 212, 214 (2d Cir.2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable juror could find in favor of that party. *Melendez v. Mitchell*, 394 Fed.Appx. 739, 740 (2d Cir.2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (citation omitted). The non-movant may not rely upon speculation or conjecture to overcome a motion for summary judgment. *Burgess v. Fairport Cent. Sch. Dist.*, 371 Fed.Appx. 140, 141 (2d Cir. 2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. *Id.*

### B. Disparate Treatment Based on Race

#### 1. Title VII and NYSHRL Claims

■ Courts in this Circuit analyze Title VII and NYSHRL claims of employment discrimination according to the three-stage, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 Fed.Appx. 10, 12 (2d Cir.2013). Under *McDonnell Douglas*, a plaintiff bears the initial, *de minimis* burden of establishing a *prima facie* case of discrimination. *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir.2008). To make out a *prima facie* case, a plaintiff must demonstrate, through direct or circumstantial evidence, that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Holcomb*

*v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir. 2008). A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside of his protected group. *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 493 (2d Cir.2010).

A plaintiff who makes out a *prima facie* case establishes a presumption of discrimination, at which point the burden of production shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the challenged conduct. *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005) (citation omitted). If the defendant produces such a reason, the plaintiff must then, without the benefit of the presumption of discrimination, "raise[ ] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the [adverse employment action] was based, at least in part," on discrimination. *Holcomb,* 521 F.3d at 141. Typically, plaintiffs who lack direct evidence of discrimination argue that the employer's stated reason for the challenged conduct is pretextual. *Id.* "[I]n many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive." *Id.* However, a showing of pretext is not required. *Id.* at 141–42. Instead, a plaintiff "alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the impermissible

factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." *Id.* at 142.

■ Title VII's statute of limitations bars claims based on events occurring more than 300 days prior to filing a charge of discrimination with a state or local employment agency. 42 U.S.C. § 2000e–5(e)(1). Plaintiff filed an administrative complaint with the SDHR on July 21, 2006. (Pl.'s 56.1 Stmt. ¶ RR.) Accordingly, only those incidents that occurred on or after September 24, 2005 are actionable under Title VII. *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 220 (2d Cir.2004) (noting that Title VII precludes recovery for discrete discriminatory acts that occurred outside the statutory time period even if other acts occurred within the time period). Discrimination claims under the NYSHRL are subject to a three-year statute of limitations. *Lange v. Town of Monroe,* 213 F.Supp.2d 411, 418 (S.D.N.Y. 2002). As this action was brought on May 4, 2007, only those incidents occurring on or after May 4, 2004 are actionable under the NYSHRL. Nonetheless, earlier incidents may be cited as background evidence in support of a timely Title VII or NYSHRL claim. *Anderson v. Nassau Cnty. Dep't of Corr.,* 558 F.Supp.2d 283, 299 (E.D.N.Y.2008).

■ Here, Moore alleges that MTA racially discriminated against him by denying him promotions to Detective, assignment to the K9 Unit, and discretionary training opportunities.[6]

---

**6.** Although Plaintiff's Amended Complaint alleges that Defendants denied him commendations on the basis of his race (Am. Compl. ¶ 175), the Court deems this claim abandoned. Defendants' Memorandum in Support of their Motion for Summary Judgment specifically addresses Plaintiff's commendation-related disparate treatment claim. (Defs.' Rev. Mem. Law Supp. Summ. J. 13–14.)

Plaintiff's Opposition brief, however, fails to make any arguments in support of this claim; instead, Plaintiff mentions the commendation denial only in the context of his hostile work environment claim. (Pl.'s Am. Mem. Law Opp'n Summ. J. 16.) "[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned." *Plahutnik v. Daikin Am., Inc.,* 912 F.Supp.2d 96, 104

First, Plaintiff claims MTA discriminated on the basis of race when it rejected his application for promotion to Detective in 2006. Even assuming *arguendo* that Moore has put forth a *prima facie* case of race discrimination, Defendants have articulated a legitimate, nondiscriminatory reason for not promoting him. Namely, Defendants argue that Plaintiff was less qualified than those officers promoted to Detective, pointing specifically to Plaintiff's writing samples, attendance record, and performance in the scenario-question portion of the interview. (Defs.' Rev. Mem. Law Supp. Summ. J. ("Defs.' Mem.") 7.)

Plaintiff has failed to raise evidence sufficient for a reasonable fact-finder to find that Defendants' rationale is pretextual. The record reflects that in the scenario portion of the interview, Plaintiff hit on fewer important points than three of the four promoted officers, and he tied with Alfalla. (Jeremias Decl. Ex. I.) The four promoted officers' reports received higher praise than Plaintiff's, and Plaintiff's attendance record was markedly worse than theirs. (Fuchs Decl. Ex. 10.) Moreover, the additional columns and comments Conner added to Crawford's spreadsheet do not indicate an improper, race-based motive. Although adding positive comments to the evaluations of promoted Caucasian or Hispanic officers and negative comments to those of unselected African–American officers might reflect such a motive, Conner added positive comments to the evaluations of four unselected candidates, including one African–American officer, and a negative comment to Alfalla's. (Fuchs Decl. Ex. 10; Jeremias Decl. Ex. I.)

Nor does Plaintiff's evidence permit a reasonable juror to find that MTA's decision was motivated both by legitimate factors and by race. Viewing the evidence in the light most favorable to Plaintiff, Moore was not more qualified for the position of Detective than the four promoted officers. *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001) ("[T]he court must respect the employer's unfettered discretion to choose among qualified candidates.") (citation omitted). Plaintiff's other evidence of discrimination consists of Howell and Smith's alleged statements and the statistical evidence of race-related disparities in advancement in rank. (Jeremias Decl. Ex. D; Moore Dep. 109:7–15, 263:1–266:8.) Although Howell's "above and beyond" comment is problematic, one comment by someone neither involved in nor privy to the 2005–06 Detective selection process cannot satisfy Plaintiff's preponderance of the evidence burden, even when viewed alongside his other evidence. (Conner Reply Decl. ¶ 6.)

Plaintiff also claims that MTA violated Title VII and the NYSHRL by denying his 2007 application for promotion to Detective. Assuming that Plaintiff has put forth a *prima facie* case of discrimination, Defendants have set out legitimate, nondiscriminatory reasons for refusing to promote Plaintiff: Moore's poor performance in the Detective selection process and poor attendance record. (Defs.' Mem. 9–10.)

Plaintiff argues that these rationales are pretextual. With regard to Plaintiff's performance in the 2007 selection process, Plaintiff argues that he performed well in his interview and was more qualified than the officers selected for further consider-

(S.D.N.Y.2012); *see also Jain v. McGraw–Hill Cos., Inc.*, 827 F.Supp.2d 272, 280 (S.D.N.Y. 2011) (holding that plaintiff abandoned six claims when her opposition papers failed to respond to defendants' arguments on those

claims); *Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 468 (S.D.N.Y.2011) ("Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument.").

ation or promoted. (Pl.'s Am. Mem. Law Opp'n Summ. J. ("Pl.'s Opp'n") 9–10.) A plaintiff who "seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer" must have "credentials . . . so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Byrnie*, 243 F.3d at 103 (citation omitted). Even viewing the facts in the light most favorable to Moore, his credentials do not meet this high standard.

Nor can Plaintiff show that the attendance rationale is pretextual. Plaintiff's attendance record was discussed at the interview, and one interviewer viewed Plaintiff's record as a potential "issue for small unit staffing." (Fuchs Decl. Ex. 17, at D00007359; Ex. 18, at D00007351; Ex. 19, at D00007329.) Plaintiff has not shown that his attendance record was similar to or better than that of the ten officers selected for further consideration. He argues that his attendance was similar to that of Finneran and Pomposello, but Moore averaged 1.8 sick days per month in comparison to Finneran's one sick day per month, and in the year of Pomposello's promotion, he took ninety-six more hours of sick time than Pomposello. (*Id.* ¶ 21 & Exs. 12, 20, 21; Fuchs Reply Decl. Ex. 13; Jeremias Decl. Ex. J, at D00017446.)

Finally, no reasonable juror could find by a preponderance of the evidence that MTA's decision was motivated in part by race. Plaintiff claims that his length and breadth of work experience and the positive feedback he received from his interviewers provides sufficient evidence of discrimination, when compared with the feedback and experience of the ten officers MTA ranked more highly. (Pl.'s Opp'n 7–10.) However, at best, the dis-

crepancy between Moore and certain other candidates is slight, and does not satisfy Plaintiff's burden, even when viewed in combination with the statistical evidence of racial disparities in advancement at MTA PD. (Jeremias Decl. Ex. D.)

Next, Plaintiff claims that MTA discriminated against him by denying his request to transfer to the K–9 Unit. Defendants do not dispute that Plaintiff is a member of a protected class and was qualified to be in the K–9 Unit. They do argue, however, that Plaintiff fails to establish a *prima facie* case because (1) he never properly applied to join the K–9 Unit; (2) MTA's failure to transfer Plaintiff was not an adverse employment action; and (3) the alleged action did not occur under circumstances giving rise to an inference of discrimination.

To establish a *prima facie* case, a plaintiff must show that "she applied for an available position for which she was qualified." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). *Burdine* "require[s] a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Id.* However, "*Burdine* is subject to modification where the facts of a particular case make an allegation of a specific application a quixotic requirement." *Id.* The "quixotic requirement" exception "is narrow and does not pertain simply because an employee asserts that an 'aura of discrimination' in the workplace somehow discouraged her from filing a formal application." *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir.2004) (quoting *Brown*, 163 F.3d at 710).

■ Here, it would be quixotic to require Plaintiff to allege that he submitted an abstract for the January 2007 K–9 Unit appointments. Moore attempted to apply for those particular vacancies, but Inspector Martelli prohibited him from submitting an abstract. In July 2006, Plaintiff emailed Martelli about "the recent rumors of future K–9 candidates," stating, "I respectfully submit a request to be considered for the K–9 Unit and will provide an abstract." (Fuchs Decl. Ex. 22.) This request was not a generalized one; rather, it was a specific request to submit a formal application for the rumored K–9 positions. In a responsive email, Martelli confirmed the rumors, stating that "upcoming positions" in the K–9 Unit would be filled by people who had applied unsuccessfully for the September 2005 K–9 Unit appointments. (*Id.*) Martelli added, "Should the Department publish future Candidate Abstract's [sic] for positions within the Canine Unit you may submit a completed Abstract through the Chain of Command for consideration." (*Id.*) As discussed in more detail *infra*, MTA's decision not to accept new abstracts for the January 2007 positions deviated from its customary practice of beginning a new application process each time new vacancies arose. Thus, Martelli's email is akin to the statement, "You may not apply for the January 2007 positions because MTA is not following its regular procedures." Title VII's application requirement ought not provide cover for employers who actively prevent their employees from applying for specific positions. *See Petrosino,* 385 F.3d at 227 (listing the purposes of Title VII's application requirement). This is particularly true here, where Plaintiff explicitly asked to submit a formal application for a particular set of vacancies. Accordingly, Plaintiff's failure to submit a formal abstract for the January 2007 K–9 Unit positions is not fatal to his claim.

■ Defendants also argue that denying Plaintiff's request to transfer to the K–9 Unit is not an adverse employment action. A transfer denial is adverse when "the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability." *Beyer,* 524 F.3d at 165; *see also id.* at 164 (citing the number of people who apply for a transfer as a measure of desirability). A reasonable juror could find that placement in the K–9 Unit was objectively and materially better than Plaintiff's assignment to District 4—Penn Station. Construing the facts in Plaintiff's favor, the evidence shows that (1) members of the K–9 Unit received a stipend of 1.5 hours pay per day worked, as compensation for supporting and housing the dogs (Ketcham Decl. ¶ 4); (2) K–9 Unit members received an MTA PD vehicle for the purpose of transporting the dogs to and from work, and were reimbursed for car maintenance, tolls, and gas (Hidalgo Dep. 416:2–417:12; Ketcham Decl. ¶ 4); (3) officers selected to transfer to the K–9 Unit were required to complete a "rigorous basic Explosive Detection Canine Handlers course" (Jeremias Decl. Ex. AAA); and (4) more than fifty officers submitted abstracts for transfer to the K–9 Unit in August 2005 (Martelli Reply Decl. ¶ 4). By denying Plaintiff's request to transfer, MTA caused him to lose out on financial compensation, benefits, training, and a highly sought-after position. Accordingly, the denial was an adverse employment action.

■ Finally, Defendants argue that Plaintiff has failed to show that the circumstances of the transfer denial give rise to an inference of discrimination. "It is well settled that 'departures from procedural regularity can create an inference of

discriminatory intent, sufficient to establish a *prima facie* case' of employment discrimination." *Nurse v. Lutheran Med. Ctr.*, 854 F.Supp.2d 300, 317 (E.D.N.Y. 2012) (citation and alterations omitted); *see also Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir.1984) ("Departures from procedural regularity ... can raise a question as to the good faith of the process where the departure may reasonably affect the decision."). The Chief of the MTA PD testified that MTA's custom and practice was to begin a fresh application process and solicit abstracts when new vacancies arose.[7] Although Inspector Martelli affirmed that no policy required the initiation of a new application process when new openings appeared (Martelli Reply Decl. ¶ 6), Defendants have pointed to only one comparable[8] instance in which MTA made multiple rounds of appointments from a single applicant pool. (Defs.' Reply to Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 35.) Thus, there is strong evidence that MTA's decision not to solicit new abstracts when the K–9 vacancies filled in 2007 arose, while perhaps not a violation of MTA PD's written policy, departed from procedural regularity. This evidence suffices to create an inference of discriminatory intent, and accordingly, Plaintiff has met his burden of establishing a *prima facie* case of discrimination.

 Defendants have put forth a legitimate, nondiscriminatory reason for MTA's denial of Plaintiff's request to transfer: only officers who applied to transfer in August 2005 were considered for the transfers that went into effect in January 2007, and Plaintiff did not apply in August 2005. (Defs.' Mem. 15–16.) However, a reasonable jury could conclude by a preponderance of the evidence that Defendants' alleged rationale is false and a pretext for discrimination. As discussed above, a reasonable factfinder could determine that MTA's regular practice was to initiate a new application process when new vacancies arose. MTA departed from that practice when it looked only to the August 2005 pool of candidates in filling the January 2007 vacancies. Departures from procedural regularity can support an inference of pretext. *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997); *see also Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir.1998) ("The evidence of [defendant]'s inconsistent application of its disciplinary policy was sufficient for the jury to have decided properly that the employer's defense was simply a pretext for discrimination....."); *Norris v. Metro–North Commuter R.R. Co.*, 522 F.Supp.2d 402, 409 (D.Conn.2007) (holding that procedural irregularity sufficed to create issue of material fact as to pretext and discriminatory intent). Here, MTA's alleged rationale for denying Plaintiff's transfer request directly contradicts its customary practice regarding the filling of vacancies. This departure from custom suffices to create an issue of material fact

---

7. Chief McConville testified in his deposition that after a set of vacancies was filled, "we would begin the process all over again if there were additional vacancies at some other point in time." In response to the follow-up question, "So that once you have completed the number of vacancies you then would start a new process if there was a vacancy a year later, let's say?", McConville responded, "Yes." (McConville Dep. 309:18–25.).

8. Defendants' second example—the three different groups of Lieutenants selected from a single Lieutenant Promotional Ranking list—is not comparable. That list explicitly stated that it would remain in effect until a new list was published. (Fuchs Reply Decl. Ex. 10, at D00007360.) In contrast, neither the August 2005 Interim Order nor the Personnel Orders listing officers transferred to the K–9 Unit indicated that only those officers who timely responded to the Interim Order would be eligible for the next several rounds of appointments. (Fuchs Decl. Ex. 23; Jeremias Decl. Ex. AAA.).

as to whether MTA's rationale is pretextual.

Beyond this indication of pretext, Plaintiff has provided additional evidence permitting a reasonable juror to find that MTA's denial of his transfer was based, at least in part, on discrimination. First, only one of the sixteen officers (6.25%) appointed to the K–9 Unit in 2007 was African–American, a disproportionately small number given that sixteen percent of MTA PD officers were African–American as of January 2005 and fifteen percent of MTA PD officers were African–American as of January 2008. (*See* Fuchs Decl. Ex. 15; Fuchs Reply Decl. Ex. 22, at D00010311; Jeremias Decl. Exs. C, JJ.) Second, Plaintiff's evidence raises an issue of material fact as to whether the K–9 Unit has a history of race discrimination. In 2008, the SDHR stated that "the Canine unit has ... proved to be particularly difficult for Black officers to enter," and found probable cause to believe that another African–American officer seeking entry to the K–9 Unit was subject to discrimination. (Jeremias Decl. Ex. KK, at D00031564–66.)[9] A reasonable juror looking at the evidence of pretext and the statistical and historical evidence of discrimination could find that race motivated MTA's denial of Plaintiff's transfer request. *Cf. Greenbaum v. Handelsbanken,* 67 F.Supp.2d 228, 252 (S.D.N.Y.1999) (Sotomayor, J.) ("Absent some explanation, this kind of [procedural] departure strongly supports an ultimate finding of discrimination."). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claims related to the K–9 Unit is DENIED.

◼ Next, Plaintiff claims that MTA's denial of his January 2005 request for Plainclothes Training was discriminatory. The "denial of professional training opportunities may constitute an adverse employment action, but only where an employee can show 'material harm' from the denial, 'such as a failure to promote or a loss of career advancement opportunities.' " *Trachtenberg v. Dep't of Educ. of N.Y.C.,* 937 F.Supp.2d 460, 468 (S.D.N.Y. 2013) (citation omitted). Here, Plaintiff has not established material harm. Moore admits that he received Plainclothes Training in June 2005, five months after his request. (Pl.'s 56.1 Stmt. ¶ R.) Although Plaintiff applied for a promotion to Detective before receiving the training, the promotion denial occurred in September 2006, approximately fifteen months after he received the training. There is no reason to believe that the promotion denial was related to the five-month delay in training, or that Plaintiff suffered any other material harm from the January 2005 denial.

◼ Plaintiff also alleges that the June 2007 cancellation of Terrorism Preparedness Training violated Title VII and the NYSHRL. Assuming that Plaintiff has established a *prima facie* case of discrimination, MTA has put forth a legitimate, nondiscriminatory rationale for the cancellation: MTA replaced the Pennsylvania-based Terrorism Preparedness Training with onsite PATRIOT Training, which Plaintiff participated in in February 2009.

---

**9.** Plaintiff also alleges that Patrick Ketcham, Caucasian, was transferred to the K–9 Unit without submitting an abstract. (Moore Decl. ¶ 26.) However, because Moore has not introduced evidence to support a finding that he has personal knowledge of whether Ketcham submitted an abstract (*id.*), his allegations are inadmissible. Fed. Rule Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Moreover, Ketcham himself affirms that he submitted an abstract for the K–9 Unit and underwent an interview before being transferred to the K–9 Unit. (Ketcham Reply Decl. ¶ 3.).

(D'Agostino Decl. Ex. A, at D00042889.) Moore's allegation that PATRIOT Training was "limited to enforcing the Patriot Act and learning methods with which to deal with the public," and, as such, was "completely different" from Terrorism Preparedness Training, is unsupported by the record. (Moore Decl. ¶ 30.) PATRIOT Training, according to the company providing the training, teaches participants to deter or minimize terrorist attacks by screening individuals entering critical infrastructure such as mass transit. (Fuchs Reply Decl. Ex. 21.) Plaintiff also argues that the one year lag between the first PATRIOT Training assignments and his assignment to PATRIOT Training indicates pretext and discrimination. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 49R.) However, African–American plaintiffs Michael Benjamin and Bryan Henry received PATRIOT training in April 2008. (D'Agostino Decl. Ex. A.) On its own, the February 2009 assignment does not indicate that MTA's rationale is pretextual or that its decision was motivated by race.

Moore also alleges more generally that he received fewer discretionary training opportunities than Caucasian personnel. In particular, he claims that he received no discretionary training other than Plainclothes Training, whereas Caucasian Officer Jamie Atkinson received more than twenty-one trainings from his time of hire through 2008 and Caucasian Detective Michael Pizzo took nearly a dozen counterterrorism training courses in less than one year. (Pl.'s 56.1 Stmt. ¶ S; Pl.'s Reply to Defs.' 56.1 Stmt. ¶ 42R.) Plaintiff's claim about his own training is belied by the record, which shows that he took three discretionary training courses between July and November 2006. (Fuchs Decl. Ex. 13, at D00007297.) Moreover, Plaintiff has not established that any difference between his training and Atkinson and Pizzo's constituted an adverse employment action. Atkinson was never promoted to

Detective, Pizzo was promoted to Detective and the Interagency Counterterrorism Task Force ("ICTF") in a year in which Plaintiff did not apply, and Plaintiff has not revealed any other material harm. (Defs.' Reply to Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 42; Atkinson Decl. ¶ 6.) Finally, Moore's allegations about Scott Crean's unspecified training courses and the unnamed Caucasian officers assigned to specialized training cannot survive summary judgment, because Plaintiff has failed to put forth specific facts showing that there is a genuine issue for trial. (Pl.'s 56.1 Stmt. ¶ O; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 44R.) Accordingly, Defendants' Motion for Summary Judgment regarding Plaintiff's Title VII and NYSHRL disparate treatment claims is GRANTED except with regard to those claims concerning the K–9 Unit.

### 2. NYCHRL Claims

The NYCHRL " 'explicitly requires an independent liberal construction analysis in all circumstances,' an analysis that 'must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's uniquely broad and remedial purposes, which go beyond those of counterpart state or federal civil rights laws.' " *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 34, 936 N.Y.S.2d 112 (N.Y.App.Div.2011) (citation omitted); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.' ") (citation omitted).

For an NYCHRL claim to survive a summary judgment motion, the plaintiff need only show that her employer treated her less well, at least in part for a

discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] *no* role" in its actions.

*Id.* at 110 n. 8 (citation omitted). "[S]ummary judgment dismissing a claim under the NYCHRL should be granted only if 'no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas,* mixed motive, direct evidence, or some combination thereof.'" *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 113, 946 N.Y.S.2d 27 (N.Y.App.Div.2012) (citation omitted). However, these evidentiary routes are not applied identically to Title VII claims. For instance, "to make out the third prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Williams v. Regus Mgmt. Grp., LLC,* 836 F.Supp.2d 159, 173 (S.D.N.Y. 2011); *see also Lytle v. JPMorgan Chase,* No. 08 Civ. 9503, 2012 WL 393008, at *19 (S.D.N.Y. Feb. 8, 2012) (NYCHRL plaintiff "does not need to demonstrate that he was subject to a materially adverse employment action."), *adopted by* 2012 WL 1079964 (S.D.N.Y. Mar. 30, 2012), *aff'd by* 518 Fed.Appx. 49 (2d Cir.2013).

Plaintiff has not raised an issue of material fact as to whether MTA's failure to promote him to Detective and alleged denial of training opportunities was "caused at least in part by discriminatory ... motives."[10] *Mihalik,* 715 F.3d at 113. The evidence discussed *supra* Part II.B.1 does not meet Plaintiff's burden to show that

the Detective promotion denials, Terrorism Preparedness Training cancellation, and unspecified divergence in training opportunities were based in part on discrimination. Moore's only evidence that the five-month delay in Plainclothes Training was motivated by race is MTA's approval, from January to June 2005, of seventeen Caucasian officers, five Hispanic officers, and four African–American officers for Plainclothes Training; the seventeen Caucasian officers' average time on the force was less than half that of the four African–American officers. (Pl.'s 56.1 Stmt. ¶ Q.) Even under the liberal NYCHRL standard, no jury viewing this evidence could find MTA liable under either *McDonnell Douglas* or a mixed motive analysis.

Plaintiff has also failed to provide sufficient evidence to show that the discrepancy between Plaintiff, Atkinson, and Pizzo's training was motivated in part by discrimination. Moore relies solely on the numerical difference in training courses. Defendants counter with the following evidence: (1) Keyla Hammam, African–American, participated in ten trainings during a seventeen-month period in her tenure as an MTA PD officer, courses that she affirms she researched and discovered herself (Fuchs Decl. Ex. 29 ¶ 2; Fuchs Reply Decl. Ex. 14); (2) Atkinson testified that he researched and identified most of his training courses himself, which Plaintiff did not do (Atkinson Decl. ¶ 2); (3) Pizzo is not an appropriate comparator, because he was assigned to ICTF during the time that he received the cited counterterrorism training courses (Jeremias Decl. Ex. II). Upon reviewing this evidence, no jury could find that the discrepancy in training opportunities was motivated, at least in part, by discrimination. Accordingly, De-

---

**10.** Because a three-year statute of limitations applies to NYCHRL claims, only incidents occurring on or after May 4, 2004 are action-

able under the NYCHRL. N.Y. City Admin. Code § 8–502(d).

fendants' Motion for Summary Judgment on Plaintiff's NYCHRL claims regarding promotions and training opportunities is GRANTED. However, Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL claim regarding denial of transfer to the K–9 Unit is DENIED.[11]

### C. Hostile Work Environment Claims

#### 1. The Pleadings

Defendants argue that the Court should not consider Moore's hostile work environment claims because the Amended Complaint failed specifically to allege a hostile work environment. (Defs.' Reply Mem. Law Supp. Summ. J. ("Defs.' Reply") 6.) Although the Amended Complaint states, "Plaintiffs were ... subjected to a hostile work environment on the basis of race," (Am. Compl. ¶ 187; *see id.* ¶¶ 219, 232), the section of the Amended Complaint referring only to Moore does not use the words "hostile work environment" (*id.* ¶¶ 169–78).

"Under Fed.R.Civ.P. 15(b), a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 569 (2d Cir. 2000) (holding that plaintiff's "failure explicitly to plead a hostile work environment claim in her Second Amended Complaint did not preclude the district court's consideration of that issue on summary judgment"). A party opposing a court's consideration of such a claim must show that the failure to plead the claim disadvantaged the opponent in presenting its case. *Id.; see Stillman v. InService Am.,*

*Inc.,* 455 Fed.Appx. 48, 51 (2d Cir.2012) (same).

▮▮▮▮ Here, Defendants have not shown that Plaintiff's failure to plead explicitly a hostile work environment claim has disadvantaged them in presenting their case. The Amended Complaint's allegations that the ten plaintiffs in this action were subjected to a hostile work environment put Defendants on notice of Moore's hostile work environment claim. Indeed, Defendants' moving memorandum acknowledges Plaintiff's hostile work environment claim. (*See* Defs.' Mem. 16 n. 23 ("Moore makes one time-barred allegation in support of a hostile work environment claim."); *id.* at 19 ("Moore cannot even establish that he suffered a *prima facie* case of ... hostile work environment."); *id.* at 20 ("Plaintiff's § 1983 claims for disparate treatment and hostile work environment are entirely duplicative of his Title VII claims....").) Defendants have not claimed that they are prejudiced by consideration of Plaintiff's hostile work environment claims, nor is the Court aware of any disadvantage to Defendants. Accordingly, the Court will consider Plaintiff's hostile work environment claims.

#### 2. Title VII and NYSHRL Claims

"In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Cruz,* 202 F.3d at

**11.** "[F]ederal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall ...." N.Y.C. Local Law No. 85 of 2005, at § 1 (Oct. 3, 2005). Thus, the Court may deny Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL denial of transfer claim without further analysis. *See Clarke v. InterContinental Hotels Grp.,*

*PLC,* No. 12 Civ. 2671, 2013 WL 2358596, at *11 n. 13 (S.D.N.Y. May 30, 2013) (denying motion to dismiss plaintiff's NYCHRL retaliation claim, "without further analysis," because the court had denied defendant's motion to dismiss plaintiff's Title VII retaliation claim).

570 (citation omitted). "A hostile working environment is shown when the incidents of harassment occur either in concert or with regularity that can reasonably be termed pervasive." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir.2010) (citation omitted). "[A] hostile work environment can also be established through evidence of a single incident of harassment that is 'extraordinarily severe.'" *Id.* (citations omitted). "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999). Whether a reasonable person would find a given work environment hostile depends on the "totality of the circumstances," consideration of which includes: (1) frequency of the conduct, (2) severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Plaintiff bases his hostile work environment claims on the following allegations: (1) In 1999, Plaintiff was instructed to teach an African–American officer how to "conduct himself" as a minority officer so as not to become one of the "problem officers" (Pl.'s 56.1 Stmt. ¶ LL); (2) In 2001, Moore learned from others that Sergeant Quinn repeatedly called him "little Farrakhan" (Moore Decl. ¶ 12); (3) Plaintiff and other minority officers discussed being called "black clouds," "militants," "black panthers," and "problem officers" (Thomas Dep. 58:20–59:6); (4) In 2007, Plaintiff spoke with D'Agostino and McConville about an African–American officer with no prior disciplinary issues who was forced to resign on the basis of not "work[ing] out"; D'Agostino and McConville explained that they were "let[ting] go" a Caucasian officer who also "wasn't working out," but Moore says the Caucasian officer is "still with the job" (Moore Dep. 134:11–135:14); (5) In 2007, in response to Plaintiff's claims of race discrimination, Police Benevolent Association ("PBA") Vice President Vincent Provenzano told Plaintiff, "They're going to promote who they want to promote anyway." (*id.* at 300:19–301:12); (6) Officer James Hidalgo told Plaintiff that MTA discriminated against Hispanics, and that he and an African–American officer had been called "Hidalgo and buck wheat" or "the Puerto Rican and buck wheat" (Pl.'s 56.1 Stmt. ¶ PP); (7) co-plaintiff Michael Benjamin told Moore that Sergeant Giel had referred to Benjamin as a "nigger" (*id.* ¶ OO; Benjamin Dep. 177:15–19); (8) as a PBA Trustee and Guardians Association member, Plaintiff was aware of alleged discrimination against African–American officers applying for the Anticrime Unit and Detective Division (Pl.'s 56.1 Stmt. ¶ KK); (9) Plaintiff believed that he was denied promotions, transfer to the K–9 Unit, commendations, and training opportunities on the basis of race (*id.* ¶ RR; Pl.'s Opp'n 16); (10) Other plaintiffs in this action have also alleged a hostile work environment on the basis of race (Pl.'s Opp'n 16–17).

With hostile work environment claims, "the crucial inquiry focuses on the nature of the workplace environment as a whole, [so] a plaintiff who [himself] experiences discriminatory harassment need not be the target of other instances of hostility in order for those instances to support [his] claim." *Cruz*, 202 F.3d at 570. It is not necessary that "offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class" for those remarks to support a plaintiff's claim. *Id.* Even if Plaintiff himself "were not present or were not the target of some of [the] racial remarks, a

jury plausibly could find that [the] persistently offensive conduct created an overall 'hostile or abusive environment,' which exacerbated the effect of the harassment [Plaintiff] experienced individually." *Id.* at 571 (citation omitted). Defendants have therefore failed to establish that there is no dispute as to any material facts, even assuming they are correct in asserting that, on their own, the comments which Caucasian officers or superiors directed at Plaintiff would be insufficient to make out a hostile work environment claim.

Accordingly, the Court reserves decision on Defendants' Motion for Summary Judgment on Moore's federal and state hostile work environment claims until after considering fully the Motions for Summary Judgment against Plaintiffs Marilyn Y. Armstrong, Bryan Henry, Nzingha M. Kellman, and Gordon Urquhart.

### 3. NYCHRL Claim

NYCHRL claims must be reviewed "separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109. For the purpose of judicial efficiency, the Court reserves decision on Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL hostile work environment claim until it considers Moore's state and federal hostile work environment claims in light of fellow Plaintiffs' allegations.

### D. Retaliation Claims

### 1. Title VII and NYSHRL Claims

Plaintiff alleges that he suffered unlawful retaliation after he filed a formal Complaint with the SDHR on July 21, 2006 and after he filed the instant lawsuit on May 4, 2007. He claims that MTA retaliated against him for filing the SDHR Complaint by denying him promotion to Detective in late-September 2006 and continuing to deny him training opportunities. Moore also alleges that MTA retaliated against

him for filing the instant lawsuit by denying him promotion to Detective on June 26, 2007, cancelling Terrorism Preparedness Training, and continuing to deny him other training opportunities.

To establish a *prima facie* case of retaliation under Title VII and the NYSHRL, a plaintiff must establish by a preponderance of the evidence: (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) a materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n. 6 (2d Cir.2011). "[I]f the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action." *Id.* The Supreme Court has recently held that if the employer does so, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer" for his Title VII claim to survive. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). Although it is not yet clear whether the "but-for" standard applies to NYSHRL claims or whether Plaintiff need only "prove that retaliation was a substantial reason for the adverse action," *see Tepperwien*, 663 F.3d at 568 n. 6, the Court need not address which standard applies because Plaintiff's retaliation claims fail under either standard.

Assuming that Plaintiff has put forth a *prima facie* case that MTA denied his 2006 promotion request in retaliation for his SDHR Complaint, MTA's alleged rationales for not promoting Plaintiff—that he gave a subpar interview and had a poor attendance record—are legitimate and nondiscriminatory. (Defs.' Mem. 7.) In re-

sponse, Plaintiff offers the following evidence of retaliation: (1) Plaintiff filed his SDHR Complaint less than two months before MTA denied his promotion request (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 15R, 48R); and (2) Sergeant Smith told Plaintiff that Ike Dennis, allegedly considered by MTA to be less confrontational regarding race issues than Moore, could be a Detective (Moore Dep. 115:7–116:3). (Pl.'s Opp'n 18–20.) [12] However, this evidence is insufficient to permit a reasonable juror to find that retaliation was a but-for cause of or a substantial reason for the promotion denial, particularly because Smith played no role in and was not privy to the 2006 Detective selection process. (Conner Reply Decl. ¶ 6.)

Next, Plaintiff argues that MTA denied his 2007 promotion request in retaliation for filing the instant lawsuit. Assuming Plaintiff has set forth a *prima facie* case of retaliation, MTA has set out legitimate, nondiscriminatory reasons for the promotion denial: Plaintiff performed poorly in the Detective selection process and had a poor attendance record. (Defs.' Mem. 9–10.) In response, Plaintiff primarily relies on the five-week duration between his filing of the Complaint and MTA's decision not to promote him. (Pl.'s Opp'n 19–20; Fuchs Decl. ¶ 17 & Ex. 16; Jeremias Decl. Ex. SS, PBA 552–53.) This evidence, on its own, fails to show that retaliation was a but-for cause of or played a substantial role in the 2007 promotion denial.[13]

Plaintiff next alleges that MTA "continued to ignore [his] requests for training" in retaliation for both his SDHR Complaint and the instant Complaint. (Pl.'s Opp'n 20.) Moore's Memorandum provides no substantive support for this argument. (*Id.* at 20–21.) The evidence Plaintiff sets forth in support of his disparate treatment claims, however, is insufficient to show that retaliation was a but-for cause of or a substantial motivation for the delay in Plainclothes Training or the discrepancy between Plaintiff and Caucasian officers' training.

Finally, Plaintiff argues that MTA cancelled Terrorism Preparedness Training in retaliation for filing the instant Complaint. (Pl.'s Opp'n 20–21.) Assuming that he has put forth a *prima facie* case of retaliation, MTA has set forth a legitimate, nondiscriminatory rationale for the cancellation. MTA cancelled the course, held in Pennsylvania, in order to replace it with the onsite PATRIOT Training course that Plaintiff attended in February 2009. (D'Agostino Decl. Ex. A, at D00042889.) The evidence discussed *supra* Part II.B.1 could not convince a reasonable juror that this rationale was pretextual or that retaliation was a but-for cause of or a substantial motive for the cancellation, and Plaintiff cites no additional evidence in support of his claim. (Pl.'s Opp'n 20–21.) Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Title VII and NYSHRL retaliation claims is GRANTED.

### 2. NYCHRL Claims

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was rea-

---

**12.** Plaintiff also argues that he was more qualified than the promoted individuals and that Defendants' rationales are pretextual (Pl.'s Opp'n 3–7, 20), arguments that, even viewing the facts in the light most favorable to Plaintiff, could convince no reasonable juror. (*See supra* Part II.B.1.).

**13.** Nor could Plaintiff's arguments that Defendants' rationales are pretextual and that he was more qualified than the officers who were promoted or selected for further consideration persuade a reasonable juror that Defendants had retaliatory motives. (*See supra* Part II.B.1; Pl.'s Opp'n 7–10, 20.).

sonably likely to deter a person from engaging in such action." *Mihalik,* 715 F.3d at 112 (citations omitted). "[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory motives, or if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'" *Id.* at 113 (citations omitted).

Even after taking into account the NYCHRL's "uniquely broad and remedial purposes," no jury could find, based on the submitted evidence, that the denials of promotions and training opportunities were caused even partly by retaliatory motives. *See Williams v. N.Y.C. Hous. Auth.,* 61 A.D.3d 62, 872 N.Y.S.2d 27, 31 (2009). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL retaliation claims is GRANTED.

### E. Pattern or Practice of Discrimination Claims

Plaintiff maintains that Defendants' conduct towards racial minorities in the MTA PD amounted to a pattern or practice of discrimination. Although Title VII initially envisioned that the government would pursue pattern or practice claims, 42 U.S.C. § 2000e–6, courts have unequivocally granted private individuals the right to vindicate those claims. *See Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 876 n. 9, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). However, "no such pattern-or-practice theory of liability is available to the private non-class plaintiffs in this case." *Chin v. Port Auth. of N.Y. & N.J. Inc.,* 685 F.3d 135, 146 (2d Cir.2012); *see also United States v. City of New York,* 631 F.Supp.2d 419, 427 (S.D.N.Y.2009) ("[I]ndividuals cannot maintain a private, nonclass, pattern-or-practice claim.").[14]

Here, Moore and his fellow Plaintiffs have not brought their claims as a class action, and thus cannot assert pattern or practice claims of discrimination. Defendants' Motion for Summary Judgment on these claims is hereby GRANTED.

### F. Claims Against MTA and Individual Defendants in Their Official Capacities Under 42 U.S.C. §§ 1981 and 1983

Plaintiff alleges that MTA is liable under 42 U.S.C. §§ 1981 and 1983 for engaging in discriminatory conduct by subjecting him to disparate treatment, a hostile work environment, retaliation, and a pattern and practice of discrimination. Plaintiff also asserts claims under §§ 1981 and 1983 against individual Defendants William Morange, Kevin McConville, and Terrance Culhane in their official capacities.[15] Plaintiff alleges that Defendants' actions deprived him of "rights, privileges and immunities secured by the United States Constitution and laws and [§ 1983]." (Am. Compl. ¶ 216.)

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits,

---

**14.** The holding in *Chin,* a Title VII case, applies to Plaintiff's NYSHRL pattern or practice claim. *See Cruz,* 202 F.3d at 565 n. 1 ("Our consideration of claims brought under the state . . . human rights law[] parallels the analysis used in Title VII claims."). It is not clear whether *Chin's* holding extends to NYCHRL pattern or practice claims. *See, e.g., Short v. Deutsche Bank Sec., Inc.,* 79 A.D.3d 503, 506, 913 N.Y.S.2d 64 (N.Y.App. Div.2010) ("[I]t is unnecessary to reach the issue whether an individual plaintiff can assert [a pattern or practice] claim" under the

NYCHRL.). Either way, Plaintiff's NYCHRL claim cannot survive summary judgment, as he "did not present evidence of widespread acts of intentional discrimination against individuals." *Id.*

**15.** Although the Amended Complaint also asserted claims against Elliot Sander (Am. Compl. ¶ 16), Plaintiff abandoned this claim when he failed to mention Sander in opposition to Defendants' discussion of Sander. *See supra* Part II.B.1 n. 6 (citing cases).

privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir.2004). Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights'"; instead, it "merely provides 'a method for vindicating federal rights elsewhere conferred,' such as those conferred by § 1981." *Patterson*, 375 F.3d at 225 (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Indeed, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units...." *Patterson*, 375 F.3d at 225 (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Although a § 1983 action may not be brought to vindicate rights conferred only by a statute that contains its own enforcement structure, such as Title VII, *Patterson*, 375 F.3d at 225, a Title VII plaintiff may bring a concurrent § 1983 claim "if some law other than Title VII is the source of the right alleged to have been denied." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir.1993); *see also Patterson*, 375 F.3d at 225 (" 'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action' ... 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.' ") (citation

omitted). Here, the sources of Plaintiff's § 1983 claim are 42 U.S.C. § 1981 and the U.S. Constitution. (Am. Compl. ¶ 216); *see also Reed v. Conn. Dep't of Transp.*, 161 F.Supp.2d 73, 85 (D.Conn.2001) (noting that the source of plaintiff's § 1983 claim was § 1981).

"[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality—or an individual sued in his official capacity—the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson*, 375 F.3d at 226 (citations omitted). The policy or custom need not be an express rule or regulation; it is sufficient for a plaintiff to show that the discriminatory conduct is so "persistent and widespread ... so permanent and well settled as to constitute a custom or usage with the force of law." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir.1992). Additionally, "a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional." *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir.2001).

Although Plaintiff alleges that MTA had a custom or policy of discrimination because it allegedly acquiesced in or condoned unlawful discrimination, the record does not support these allegations. Moore claims that McConville and Morange took no affirmative steps in response to the complaints of discrimination they received. (Pl.'s Opp'n 24.) He also alleges that Culhane discriminated against him by denying him discretionary training. (*Id.*) Finally, Plaintiff alleges that not all MTA supervisors were well trained in MTA's EEO policy. (*Id.* at 23.)[16] Plain-

---

16. Moore does not assert that Defendants' denial of his request to transfer to the K–9 Unit was part of a pattern or practice of discrimination. However, even if he did make such an argument, the claim would fail.

Plaintiff has put forth facts showing that the denial of his request departed from MTA PD's customs and practices. The facts suggest that this was an isolated incident, and accordingly, it does not constitute a policy or custom.

tiff's generalized allegations about McConville and Morange are insufficient to show that MTA had a policy or custom of discrimination. In addition, Plaintiff has presented no evidence showing that the alleged denial of discretionary training was discriminatory, let alone pursuant to a general policy or practice of discrimination. The conduct that Plaintiff alleges does not amount to a practice that is "so persistent and widespread as to constitute a custom or usage with the force of law." *Sorlucco*, 971 F.2d at 870–71.

Plaintiff's general allegations that MTA "has subjected, at a minimum, all ten Plaintiffs to disparate treatment, a hostile work environment, retaliation and a pattern and practice of 'persistent and widespread discrimination' " are insufficient, as a matter of law, to defeat summary judgment. (Pl.'s Opp'n 23.) Plaintiff has not, as required, "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.*, 607 F.3d at 292. Because Moore cannot demonstrate that MTA had a custom or policy of discrimination, he is unable to state a claim against MTA or the individual Defendants in their official capacities under §§ 1981 or 1983. Accordingly, Defendants' Motion for Summary Judgment on these claims is GRANTED.

### G. Claims Against Individual Defendants in Their Individual Capacities Under 42 U.S.C. §§ 1981 and 1983

Plaintiff Moore also asserts claims under §§ 1981 and 1983 against Defendants McConville and Culhane in their individual capacities. To make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Patterson*, 375 F.3d at 229 (citation omitted). Similarly, a plaintiff must establish an individual defendant's personal involvement in the claimed violation to find him liable in his individual capacity under § 1983. *Id.* "A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." *Rolon v. Ward*, 345 Fed.Appx. 608, 611 (2d Cir.2009) (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir.2003)).

▌ As to Culhane, Plaintiff alleges that he held the position of Chief of the Region in which eight of the ten Plaintiffs worked, had a history of racial bias, and denied Moore Plainclothes Training while approving the Training for Caucasian officers. Because the denial of Plainclothes Training was not an adverse action, Culhane's participation cannot subject him to individual liability under §§ 1981 and 1983. *See Conklin v. Cnty. of Suffolk*, 859 F.Supp.2d 415, 440 (E.D.N.Y.2012) ("These threats ... are insufficient to constitute an adverse employment action and thus are insufficient to demonstrate [defendant]'s personal involvement."). Plaintiff fails to allege specific facts to indicate that Culhane was personally involved in discrimination or retaliation against Plaintiff, except with regard to his involvement in sustaining a hostile work environment, on which the Court reserves judgment.[17]

---

**17.** Because the Court reserves judgment on Plaintiff's hostile work environment claims, the Court also reserves judgment as to Plaintiff's § 1981, § 1983, NYSHRL, and NYCHRL hostile work environment claims brought against Culhane and McConville in their individual capacities.

In contrast, a reasonable jury could find that Chief McConville was personally involved in the denial of Plaintiff's request to transfer to the K–9 Unit. McConville testified that he was responsible for implementing the recommendations of an MTA panel as to who should be transferred to the K–9 Unit and that he had the authority to act against the recommendations of the panel. (McConville Dep. 27:4–28:16.) He also testified that, before the January 2007 selections were made, he discussed Plaintiff's July 2006 email requesting a transfer with Inspector Martelli; during this conversation, Martelli informed McConville that the email came in after the August 2005 deadline. (*Id.* at 306:24–307:5.) Although McConville had the authority to do so, he did not tell Martelli to consider Moore's request or to permit Plaintiff to submit a full abstract. (*Id.* at 306:24–307:5.) The above evidence raises a triable issue of material fact as to whether McConville was personally involved in the denial of Plaintiff's request to be transferred to the K–9 Unit. *See, e.g., Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir.2013) (noting that supervisor's awareness of alleged constitutional violation constitutes personal involvement unless he takes appropriate remedial action); *Conklin*, 859 F.Supp.2d at 441–42 (noting that supervisor's knowledge of claimed wrongdoing and ability to take remedial action would constitute personal involvement); *Schanfield v. Sojitz Corp. of Am.*, 663 F.Supp.2d 305, 344–45 (S.D.N.Y. 2009) (holding that plaintiff raised issue of material fact as to C.F.O.'s personal involvement in plaintiff's termination where management sought C.F.O.'s feedback on plaintiff close to the time of his termination). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's §§ 1981 and 1983 individual capacity claims against McConville is DENIED with regard to the K–9 Unit allegations.

Plaintiff also alleges that McConville signed off on the 2005 and 2007 Detective selections and failed to take remedial action despite being aware of his and others' complaints of discrimination. In particular, Plaintiff alleges that McConville did not respond to Plaintiff's letter complaining about the 2007 Detective selection process. McConville, however, referred the letter to Jessie Crawford, who did respond. (Jeremias Decl. Ex. BB.) Moreover, as discussed *supra*, Moore has not demonstrated any genuine dispute of material fact as to whether the 2007 Detective selection process was tainted by race discrimination. Plaintiff also alleges that McConville failed to take remedial action after co-plaintiff Mazyck complained about MTA's treatment of co-plaintiff Benjamin and two non-Plaintiffs. With regard to McConville's action regarding the treatment of Benjamin, the record demonstrates that McConville did respond and referred the matter to MTA PD's Internal Affairs Bureau. (*See, e.g.* Jeremias Decl. Opp. Defs.' Summ. J. Mot. Michael Benjamin Ex. B, at D00003172; McConville Dep. 68:7–25, 103:8–16, 106:15–107:2.) Plaintiff's other general allegations that McConville failed to take appropriate remedial action are simply insufficient to raise an issue of material fact regarding McConville's individual liability. With the exception of the K–9 transfer process, Moore has failed to demonstrate that McConville was even aware that "constitutional violations [were] occurring." *Patterson*, 375 F.3d at 229. Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to Moore's §§ 1981 and 1983 claims against Culhane and McConville in their individual capacities except for those related to his hostile work environment allegations, on which the Court reserves judgment, and the claim against McConville regarding the K–

9 Unit transfer denial, on which summary judgment is DENIED.

## H. Aiding–and–Abetting Claims Against Individual Defendants in Their Individual Capacities Under the NYSHRL and NYCHRL

[24–26] Plaintiff asserts that Culhane and McConville should be held individually liable under the NYSHRL and NYCHRL as aiders and abettors.[18] Under the NYSHRL and NYCHRL, it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [provision], or to attempt to do so." N.Y. Exec. Law § 296(6); Admin. Code N.Y.C. § 8–107(6). Actual participation in conduct giving rise to a discrimination claim may support liability under both statutes. *See Malena v. Victoria's Secret Direct, LLC,* 886 F.Supp.2d 349, 367 (S.D.N.Y.2012). Liability "may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct." *Morgan v. N.Y. State Att'y Gen.'s Office,* No. 11 Civ. 9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013). However, "aiding and abetting 'is only a viable theory where an underlying violation has taken place.'" *Petrisch v. HSBC Bank USA, Inc.,* No. 07 Civ. 3303, 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013) (citation omitted). Finally, under both statutes, "'an individual may not be held liable merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating' that law." *Malena,* 886 F.Supp.2d at 367–68 (citation and alterations omitted).

As discussed *supra,* Plaintiff has only raised an issue of material fact as to the K–9 Unit allegations. A reasonable juror could find that McConville's conversation with Martelli about Plaintiff's request for transfer, combined with McConville's failure to investigate further or take remedial measures, constituted actual participation in Martelli's denial of Plaintiff's request. *See, e.g., Schanfield,* 663 F.Supp.2d at 344–45 (denying summary judgment on NYSHRL and NYCHRL aider-and-abettor claims against C.F.O. where C.F.O.'s feedback was sought regarding plaintiff near the time of plaintiff's termination). However, Plaintiff has failed to show that Culhane participated in the denial of Plaintiff's request to transfer. Plaintiff has not raised genuine issues of material fact regarding the other alleged NYSHRL or NYCHRL violations. Accordingly, the Court reserves judgment on whether Culhane and McConville aided and abetted the creation of a hostile work environment, DENIES Defendants' Motion for Summary Judgment as to Plaintiff's NYSHRL and NYCHRL aiding-and-abetting claims against McConville with regard to the denial of Moore's request to transfer to the K–9 Unit, and GRANTS Defendants' Motion for Summary Judgment as to all other NYSHRL and NYCHRL aiding-and-abetting claims.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part, DENIED in part, and decision is reserved in part, as follows:

(1) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's disparate treatment claims regarding the

---

**18.** Although the Amended Complaint asserted NYSHRL and NYCHRL claims pursuant to N.Y. Exec. Law § 296 *et seq.* and N.Y.C. Admin.Code § 8–107 *et seq.,* Plaintiff abandoned any individual liability claims brought under N.Y. Exec. Law § 296(1)(a) and N.Y.C. Admin. Code § 8–107(1)(a) when he failed to mention those provisions or direct individual liability in opposition to Defendants' discussion of direct individual liability. (*See* Defs.' Mem. 24); *see supra* Part II.B.1 n. 6 (citing cases).

denial of promotions and discretionary training opportunities brought under Title VII, NYSHRL, NYCHRL, § 1981, and § 1983;

(2) Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's disparate treatment claims regarding the denial of Plaintiff's request to transfer to the K–9 Unit brought against MTA under Title VII, NYSHRL, and NYCHRL, and brought against McConville in his individual capacity under § 1981, § 1983, NYSHRL, and NYCHRL; but it is GRANTED as to Plaintiff's disparate treatment claims regarding the transfer denial brought against the individual Defendants in their official capacities under § 1981 and § 1983, and brought against Culhane in his individual capacity under § 1981, § 1983, NYSHRL, and NYCHRL;

(3) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claims brought under Title VII, NYSHRL, NYCHRL, § 1981, and § 1983;

(4) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's pattern or practice claims brought under Title VII, NYSHRL, NYCHRL, § 1981, and § 1983;

(5) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's § 1981 and § 1983 claims brought against MTA and the individual Defendants in their official capacities; and

(6) Decision is reserved with respect to Plaintiff's hostile work environment claims brought against MTA under Title VII, NYSHRL, and NYCHRL, and brought against Culhane and McConville in their individual capacities under § 1981, § 1983, NYSHRL, and NYCHRL.

SO ORDERED.